## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| In Re Carolyn D. Whitfield, | : | BR NO. 16-10709- ELF |
| Debtor | : | |
| | : | Chapter 13 Bankruptcy |
| | : | |
| | : | |

### DEBTOR'S POST-TRIAL MEMORANDUM OF LAW IN SUPPORT OF DEBTOR'S OBJECTION TO THE PROOF OF CLAIM (P.O.C. #9-1) FILED BY WILMINGTON SAVINGS FUND SOCIETY

### I.    INTRODUCTION

The matter before this Court is the debtor Carolyn Whitfield's ("Whitfield") Objection to the Proof of Claim (P.O.C. # 9-1) filed in this bankruptcy case by Wilmington Savings Fund Society, FSB, as Trustee for the PrimeStar-H Fund I Trust ("WSFS"); and the Response of WSFS to the Debtor's Objection.   After a hearing on the objection on June 26, the Court granted leave for the parties to file post-trial memorandums of law. Whitfield hereby files this Memorandum in support of her objection and, for all the reasons stated therein, asks that the Court enter the attached order granting the debtor' objection and reducing the secured claim for arrears of WSFS to $20,992.64 dollars.

### II.    FACTS & PROCEDURAL HISTORY

Carolyn Whitfield is the debtor in this bankruptcy case.  She owns the real property at 1627 Nedro Avenue, Philadelphia, Pennsylvania ("Property") which is a single-family home and her residence. On December 6, 1999, Whitfield purchased the Property[1].  At the same time, she

---

[1] Whitfield's deed to the Property is a matter of public record on file at the Philadelphia Dept. of Records, Document I.D. # 50018145, and recorded January 7, 2000.  The deed and the subsequent chain of assignments from CIT Group to Wilmington Savings Fund Society are all on record at the Philadelphia Dept. of Records. The Court may take judicial notice of the recorded deed as well as the chain of assignments since these documents are part of the public record that is not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b) (2).

executed a mortgage for $55,593.00 originated by CIT Group/Consumer Finance Inc. and secured by a lien on the Property. See Exh. 1 (WSFS Mortgage). The mortgage was subsequently recorded in the Office of the Recorder of Deeds, Philadelphia County, Document I.D. No. 50018146. See Exh. 1. The mortgage was assigned from CIT Group via a chain of assignment to EMC Mortgage Company ("EMC") and on November 10, 2015, EMC assigned the loan to WSFS and filed the assignment of mortgage with the Philadelphia Dept. of Records on November 13, 2015 as Document No. 52988398.

On July 8, 2013, the prior loan servicing agent[2], Statebridge Company, L.L.C., mailed a "NOTICE OF INTENTION TO FORECLOSE" to Whitfield. See Exh. 5 ("Statebridge Notice"). On December 24, 2013, WSFS initiated a mortgage foreclosure action in the Philadelphia Court of Common Pleas by filing a Complaint alleging that Whitfield had defaulted on the note and mortgage by failing to make monthly payments due. See Exh. 4 ("Foreclosure docket"); See Exh. 6 ("WSFS Complaint") The Complaint was assigned to Philadelphia's mortgage foreclosure "Diversion" program to attempt to resolve the matter without further litigation. See Exh. 4. After several months in the Diversion Program, WSFS entered a praecipe for default judgment on January 14, 2015. See Exh. 4. Whitfield moved to strike or open the judgement; and on March 27, 2015, the Honorable Linda Carpenter entered an order striking/opening the default judgment. See Exh. 4.

On February 2, 2016, Whitfield filed the instant bankruptcy case under Chapter 13. As part of her filing, the Debtor filed three "cure" plans each proposing to pay WSFS' secured claim for arrears in full to the extent that such a claim is filed and allowed by the Court. See Debtor's 3d Amended Plan (Docket Entry No. 111). However, the parties dispute the precise amount of WSFS' secured claim for arrears. On June 30, 2016, WSFS filed a Proof of Claim

---

[2]Prior to the debtor's filing bankruptcy on February 2, 2016, Statebridge Company, L.L.C. was the servicing agent for the loan on behalf of WSFS and its predecessors-in-interest. Post-petition, BSI Financial Services became the new servicing agent. To the best of the debtor's knowledge, BSI currently services the mortgage. See Notice of Transfer of Claim (Docket Entry No. 88).

(P.O.C. # 9-1) alleging a total secured claim for $108,396.58 dollars and a secured claim for the arrears for $29,972.28. See Exh. 8 (P.O.C. #9-1). See also E.D.Pa. Bankr. Ct. Claims Register (WSFS P.O.C. # 9-1)[3]. Whitfield filed an objection to WSFS's proof of claim on August 9, 2016. (Docket Entry No. 48). WSFS filed a Response to the debtor's objection on September 26, 2016. (Docket Entry No. 65). The parties made a substantial effort to resolve this matter via a loan modification, however, this was unsuccessful and the parties moved forward with litigation. After discovery was completed, the Court held a hearing on the debtor's objection on June 26, 2017. At the conclusion of the hearing, the Court granted leave for the parties to file post-trial memorandum of law by August 4th, with any reply briefs to be filed on or before August 23rd. (Docket Entry No. 142). Whitfield hereby files her Post-Trial Memorandum of Law.

### III.    ARGUMENT

#### A.    The Shifting Burdens of Proof Between the Parties

Federal Rule of Bankruptcy Procedure 3001(f) provides that "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." The Third Circuit has noted that "[t]he burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. § 502(a) rests on different parties at different times." In re Allegheny Int'l, Inc., 954 F.2d 167, 173 (3d Cir. 1992). The Court then discussed the shifting burdens of proof in detail, stating that:

> "[i]nitially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is '*prima facie*' valid . . . . In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward.

---

[3] The Court may take judicial notice of the contents of the Proof of Claim since its contents are an "adjudicative fact" that is not subject to reasonable dispute because it "can be accurately and readily determined from sources [i.e. the BR Claims Register] whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b) (2). The court may take judicial notice at any stage of the proceeding and "must take judicial notice if a party requests it and the court is supplied with the necessary information." See Fed. R. Evid. 201(c), (d).

The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim. It is often said that the objector must produce evidence equal in force to the *prima facie* case . . . . In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.

If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence . . . . The burden of persuasion is always on the claimant."

In re Allegheny Int'l, Inc., 954 F.2d 167, 173–74 (3d Cir. 1992) (internal citations omitted).

Bankruptcy courts in the Eastern District of Pennsylvania have consistently adopted the standard set out in In Re Allegheny International, Inc. See, e.g., In re Milbourne, 557 B.R. 376, 388 (Bankr. E.D. Pa. 2016) (Chan, J.) (per Allegheny International, Inc., if the objector successfully refutes the claimant's *prima facie* claims, the burden of proof shifts back to the claimant to "prove the validity of [its] claim[s] by a preponderance of the evidence."); In re Henry, 546 B.R. 633, 635 (Bankr. E.D. Pa. 2016) (Frank, J.) (relying on Allegheny Int. and concluding that "the ultimate burden of proof remains with the claimant"); In re Freeman, 540 B.R. 129, 135 n. 8 (Bankr. E.D. Pa. 2015) (Frank, J.) (relying on Allegheny Int., and stating, "[b]efore such the [sic] objection can be sustained, the court must hold a hearing at which the objector offers evidence that rebuts an element of the claim. Once such evidence has been offered, the objector's burden of production has been met and the ultimate burden of proof rests with the claimant.").

An objecting party's initial burden of production is satisfied if the objector produces evidence that raises a question about one or more of the respondent's claims. See Washington v. Hovensa LLC, 652 F.3d 340, 345 n.2 (3d Cir. 2011) ("the burden of production [compared to the burden of proof] does not concern the quantum of proof required for a party to ultimately prevail, but instead determines which party must first present evidence sufficient to raise a given issue as pertinent").

To satisfy the initial burden of production, the objecting party must produce "substantial evidence" or evidence "which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." In re Allegheny Int'l, Inc., 954 F.2d at174; In re Hemingway Transp., Inc., 993 F.2d 915, 925 (1st Cir. 1993) (objecting party has initial burden of producing substantial evidence); In re Spirco, Inc., No. 93-23033-BM, 1995 WL 500572, at *6 (Bankr. W.D. Pa. Aug. 14, 1995) (objection must be supported by substantial evidence). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Helen Mining Co. v. Elliott, 859 F.3d 226, 233 (3d Cir. 2017). "The amount required [for 'substantial evidence'] is more than a mere scintilla, but less than a preponderance of the evidence." Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Green v. Colvin, 179 F. Supp. 3d 481, 484 (E.D. Pa. 2016) (same).

In this case, Whitfield, for all the reasons set out below, has satisfied her burden by producing substantial evidence that undermines two of WSFS' claims.   First, the evidence shows that, as a matter of law, Whitfield does not owe the $5,762.47 demanded for attorney's fees and legal costs by WSFS.  Second, the evidence also shows that WSFS cannot show that $3,217.17 demanded for hazard insurance premiums included in its proof of claim are reasonable or actually incurred. This evidence is more than enough to satisfy Whitfield's burden of production and negate the prima facie validity of WSFS's proof of claim.  The ultimate burden of proof then shifts to WSFS to prove the validity of these charges and premiums by a preponderance of the evidence. See In re Allegheny Int'l, Inc., 954 F.2d at 173–74.  The burden of proof by a preponderance of the evidence "requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." Syblis v. Attorney Gen. of U.S., 763 F.3d 348, 357 (3d Cir. 2014). However, as discussed below, WSFS has failed to meet that burden and therefore the Court should disallow these amounts and reduce WSFS's proof of claim by $8,979.64.

**B.**   **The $5,762.47 Demanded for Attorney's Fees Should be Disallowed Because WSFS Failed to Comply with the Notice Requirements of Pennsylvania Act 91**

WSFS's proof of claim includes a demand for $5,762.47 in "prepetition fees due". See Exh. 8 (WSFS P.O.C. #9-1). See also E.D.Pa. Bankr. Ct. Claims Register (WSFS P.O.C. # 9-1). The debtor disputes that $5,762.47 in attorney's fees or legal costs are due, first and foremost, because WSFS[4] failed to mail Whitfield a proper "Act 91 notice" prior to filing a foreclosure action on December 24, 2013, as required by Pennsylvania mortgage foreclosure law Act 91 of 1983, 35 P.S. § 1680.401c et seq. ("Act 91"). Thus, as a matter of a law, WSFS is not entitled to the $5,762.47 and the Court should disallow this amount.

**1.   WSFS Was Required To Send A Proper Act 91 Notice Prior To Filing Foreclosure**

Pennsylvania's Act 91 requires that a lender mail a pre-foreclosure notice containing specific information ("Act 91 Notice") to a delinquent borrower prior to the commencement of any foreclosure action. Section 1680.402c (a) of the Act mandates that:

> Before any mortgagee may accelerate the maturity of any mortgage obligation covered under this article, *commence any legal action including mortgage foreclosure to recover under such obligation*, or take possession of any security of the mortgage debtor for such mortgage obligation, such mortgagee shall give the mortgagor notice as described in section [1680.403c]." (emphasis added).

35 Pa. Stat. Ann. § 1680.402c (a) ["Notice and institution of foreclosure proceedings"].

Subsection § 1680.403c (a) of the Act similarly provides that "[a]ny mortgagee who desires to foreclose upon a mortgage shall send to such mortgagor at his or her last known address the notice provided in subsection (b)." 35 Pa. Stat. Ann. § 1680.403c ["Notice requirements"]; See also 12 Pa. Code § 31.203(a) ["Notice; application procedures"] (regulations issued by the Pennsylvania Housing Finance Agency – "PHFA").

---

[4] The fact that the prior servicer Stonebridge Mortgage, L.L.C. was the entity that actually mailed any pre-foreclosure notices to Whitfield is irrelevant. As the servicing agent for the loan, Stonebridge was acting as an authorized agent for WSFS as the loan holder. See, e.g., Thomas v. U.S. Bank Nat. Ass'n, 474 B.R. 450, 452 (D.N.J. 2012) ("a mortgage holder is a lender which owns a homeowner's mortgage whereas a servicer is a separate entity that acts as the mortgage holder's agent to collect payments due on the mortgage"). For simplicity, in this memorandum the term "WSFS" will refer both to WSFS individually as the mortgage holder and collectively to Wilmington Savings Fund Society, inclusive of its agents Stonebridge and BSI.

Pursuant to these two sections of Act 91, until a lender sends the Act 91 notice and the

initial 33-day "stay" period has passed, the lender may not legally file a foreclosure. See 35 Pa. Stat.

Ann. § 1680.403c (b) (4)[5]. See also Hammill v. Bank of Am., N.A., No. CIV.A. 12-0117, 2013 WL

4648317, at *1 (W.D. Pa. Aug. 29, 2013), aff'd, 569 F. App'x 133 (3d Cir. 2014) ("[Act 91] requires

that lenders provide notice to defaulting borrowers *prior* to filing a foreclosure action") (emphasis

in original). Once the required Act 91 notice has been mailed and thirty-three days have passed, if a

borrower fails to apply to the Homeowner' Emergency Mortgage Assistance Program for a

"HEMAP" loan, a mortgage lender may commence foreclosure or take other legal action. See 35

Pa. Stat. Ann. § 1680.403c (c). Conversely, if a lender fails to send the required Act 91 notice, the

lender is not legally entitled to a commence foreclosure action. See 35 Pa. Stat. Ann. § 1680.402c

(2); 12 Pa. Code § 31.203(a). By implication, if the lender is not legally entitled to foreclose, it is

likewise not legally entitled to attorney's fees or legal costs related to the invalid foreclosure.

In Whitfield's case, there are two relevant questions related to Act 91: 1) whether or not the

debtor's mortgage is a "mortgage" covered by Act 91; and 2) if Whitfield's mortgage *is* covered,

whether the pre-foreclosure notice sent to her by WSFS is compliant with Act 91.  The Act states

that:

> For the purpose of this article, the term "mortgage" shall include any obligation
> evidenced by a security document and secured by a lien upon real property located
> within this Commonwealth including, but not limited to, a deed of trust and land
> sale agreement."

35 Pa. Stat. Ann. § 1680.401c (a) ["General Authority"].

Regulations issued by the Pennsylvania Housing Finance Agency ("PHFA") further define

a "mortgage" as:

> A lien, other than a judgment, on a fee simple or leasehold interest in real property
> which constitutes the principal residence of the mortgagor, obligor or debtor, located
> in this Commonwealth together with credit instruments secured thereby. The term

---

[5] The stay prohibiting commencement of any legal action may remain in place longer than 33 days once a borrower
applies to the Homeowners' Emergency Mortgage Assistance Program for a "HEMAP" Loan and also while the
Pennsylvania Housing Finance Agency ("PHFA") reviews the pending loan application.  See 35 Pa. Stat. Ann. §
1680.403c (b) (4) – (7).

includes an installment sales agreement or installment sales contract. The term also includes an obligation evidenced by a security lien on real property upon which an owner-occupied mobile home is located.

12 Pa. Code § § 31.201. ["Definitions"].

Whitfield's mortgage falls within Act 91's definition of "mortgage". The debtor's 1999 mortgage is a security document secured by a lien upon real property in Pennsylvania since the mortgage document establishes a security interest in the real property at 1627 Nedro Avenue, Philadelphia, PA 19141. See Exh. 1 (Mortgage). Whitfield testified that 1627 Nedro Avenue is her single-family home and her residence. Hearing Record at 9:45 to 9:50 a.m.[6] ("H.R. ___"). Nor do any of the seven listed exclusions to coverage under Act 91 apply. See 35 P.S. § 1680.401c (a) (1) – (7). For example, the mortgage contains no evidence that it is a mortgage" *not* covered by Act 91. The mortgage is not labeled as a mortgage insured by the Federal Housing Administration, i.e., an "FHA mortgage", the mortgage does not refer to the FHA, and it is not stamped with an FHA case number. See Exh. 1. Whitfield also testified that her loan is not a FHA mortgage. H.R. at 9:55 to 9:57 a.m. Thus, the loan does not fall under the exception to Act 91 for federally-insured mortgages. See § 1680.401c (a) (3). Similarly, CIT Group is a corporate lender; the Statebridge Notice shows that the loan was less than twenty-four months delinquent; and it also shows that the arrears were less than $60,000 when the Notice was mailed on July 8, 2013. See Exh. 6 (WSFS Complaint); Exh. 5 (Statebridge Notice). Thus, the loan does not fall under the exclusions listed in § 1680.401c (a) (4), (5) or (6) of the Act. Nor has WSFS shown that any of the other statutory exceptions to Act 91 apply. See § 1680.401c (a) (1) – (7).

Whitfield has offered substantial evidence showing that her mortgage is covered by Act 91. The burden shifts to WSFS to affirmatively show by a preponderance of the evidence that the loan is not covered Act 91. See In re Allegheny Int'l, Inc., 954 F.2d at 173–74. However, at the hearing on June 26, WSFS offered no evidence whatsoever that any of the seven exceptions to Act 91 are

---

[6]The location of testimony from the Hearing Record is by time based on the electronically recorded hearing transcript played back via an "FTR Player".

applicable in this case.  See Hearing Record *passim*.  For example, nowhere in its Complaint does

WSFS allege that the loan is an "FHA mortgage" exempt from coverage under Act 91.  See Exh. 5

*passim*. In fact, in the Complaint filed by WSFS, the lender admits that it sent Whitfield any

required pre-foreclosure notices "under Act 6/91 as may be applicable" essentially admitting that

Act 91 applies.  See Exh. 5, ¶ 6.

WSFS may try to argue that Act 91 does not apply to Whitfield's loan because the

mortgage's original principal balance of $55,593.00 exceeds the $50,000 'base figure' limitation on

loans covered by Pennsylvania's *other* major foreclosure law, Act 6 of 1974. 41 P.S. § 101.  It is

true that the coverage of *Act 6* in 1999 was limited to a "base figure" of $50,000[7]. However, this

argument confuses the definition of "*residential mortgage*" under Act 6, with the applicable

definition of "*mortgage*" under Act 91, which has no such cap.  See 35 P.S. § 1680.401c [defining

"mortgage" under Act 91]. Compare 41 P.S. § 101 [defining "residential mortgage" under Act 6].

See also Irv Ackelsberg, Residential Mortgage Foreclosures: Pennsylvania Law and

Practice, 4-7 (2ND Ed. 2014) (contrasting Act 6 and Act 91 and noting that Act 91 applies to

mortgages generally, "regardless of the amount of the obligation secured").  Since Act 91 has no

dollar amount cap, Whitfield's mortgage cannot be excluded on that basis.

## 2.  The Notice Sent by WSFS Plainly Fails to Comply With Act 91

The next issue is whether the notice sent to Whitfield on July 8, 2013 actually complies with

the notice requirements in § 1680.403c of Act 91.   The Complaint filed by WSFS includes a

"Notice of Intention to Foreclose (Act 6 Notice)" allegedly mailed to Whitfield on July 8, 2013 by

Statebridge Mortgage, L.L.C.  See Exh. 6 (WSFS Complaint); see also Exh. 5 (Statebridge Notice).

At the hearing on June 26, WSFS offered no evidence that it had sent any other pre-foreclosure

notices to Whitfield. See Hearing Record *passim*.

---

[7]The $50,000 cap on mortgage loans covered by Act 6 was increased in 2008 to $217,873 dollars.  See 41 P.S. § 101
(defining "base figure").

The Statebridge Notice plainly does not comply with Act 91. Act 91 requires that the pre-foreclosure notice sent to a borrower must contain detailed and specific information. See 35 P.S. § 1680.403c (b) (1); See also 12 Pa.Code § § 31.203(a). This information must include: i) an itemized breakdown of the arrears due; ii) notice that the borrower has a right to apply for a loan from the Homeowners' Emergency Mortgage Assistance Program ("HEMAP"); iii) notice that the borrower has thirty-three days to meet with a qualified consumer counseling agency to apply for HEMAP or otherwise try to resolve the delinquency, and iv) contact information for these local counseling agencies. See 35 P.S. § 1680.403c (b) (1); See also 12 Pa.Code § § 31.203(a) ["Notice; application procedures"]. The Pennsylvania Housing Finance Agency ("PHFA") has also promulgated a standardized model "Act 91 Notice" which presumptively satisfies the requirements of the Act. See 12 Pa.Code § 31.211, "Appendix A" (model Act 91 notice). A true and correct copy of the model Act 91 notice included in the regulations is attached hereto as Exh. 10[8].

Even a cursory review of the Statebridge Notice shows that it fails to comply with Act 91. The Statebridge Notice *does provide* Whitfield with an itemized breakdown of the arrears due. See Exh. 5 ("Statebridge Notice"). But *it fails to provide* Whitfield with: i) notice that she has a right to apply for a HEMAP loan; or ii) notice that she has thirty-three days to meet with a qualified consumer counseling agency to apply for HEMAP or otherwise try to resolve the delinquency. See Exh. 6 (WSFS Complaint); Exh. 5 (Statebridge Notice). The Statebridge Notice also fails to provide Whitfield with any contact information for any local counseling agencies. See Exh. 6; Exh. 5. Compare 12 Pa.Code § § 31.211, "Appendix A" (model Act 91 notice). It is clear from comparing the two documents that WSFS failed to comply with the notice requirements of Act 91.

---

[8]The model Act 91 Notice is included in the Appendix to 12 Pa. Code § 31.211. It is part of a duly promulgated regulation or a 'legislative fact' that the Court may consider. To the extent that the contents of PHFA's model Notice raise issue of fact, the Court may take judicial notice of the contents of the model Notice since they "can be accurately and readily determined from sources [i.e., the Pa. Code] whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b) (2). The court may take judicial notice at any stage of the proceeding and "must take judicial notice if a party requests it and the court is supplied with the necessary information." See Fed. R. Evid. 201(c), (d).

### 3. __Whitfield Has Shown That She was Prejudiced as Required by Act 70__

Additionally, Whitfield has also satisfied the requirements of Pennsylvania Act 70, including

showing that she suffered prejudice because of WSFS' failure to provide an Act 91 Notice.  Enacted

in 2012, Act 70 states in relevant part that "[t]he following provisions shall apply relating to the

Homeowner's Emergency Mortgage Assistance Program:

> (1) *If there has been a failure to comply with the ["Act 91"] notice requirements*
> of sections 402-C and 403-C of the act of December 3, 1959 (P.L. 1688, No.
> 621), known as the Housing Finance Agency Law, *and such failure has been*
> *properly raised in a legal action*, including an action in foreclosure, for
> money due under the mortgage obligation or to take possession of the
> mortgagor's security, the court may dismiss the action without prejudice,
> order the service of a corrected notice during the action, impose a stay on any
> action *or impose other appropriate remedies in the action to address the*
> *interests, if any, of the mortgagor who has been prejudiced thereby*.

35 P.S. § 1681.5(1). ["Effect of noncompliance with notice requirements in the Homeowner's
Emergency Mortgage Assistance Program"] (emphasis added).

In this case, Whitfield has properly raised WSFS' failure to comply with Act 91 by way of

her objection to WSFS's proof of claim, which is now before this Court. <u>See</u> Debtor's Objection

(Docket Entry #48)[9]. The prejudice suffered by Whitfield is self-evident. Counsel for WSFS, Stern

& Eisenberg, P.C. filed a foreclosure action against 1627 Nedro Avenue on December 24, 2013. <u>See</u>

<u>Exh.</u> 6 (Complaint). The discovery provided by WSFS shows the law firm of Stern & Eisenberg,

P.C. billed $250 to WSFS in attorney's fees and legal costs for work done on October 31, 2013 –

just two months before filing the foreclosure. <u>See</u> <u>Exh.</u> 11 (WSFS discovery response); <u>Exh.</u> 12

(WSFS supplemental discovery response); <u>Exh.</u> 14 (Table of "Attorney's Fees and Costs with

Invoice").  The remaining balance of $5,052.16 in fees and costs was for work billed by Stern &

Eisenberg between February 2, 2014 and December 18, 2015 – just after the foreclosure was filed

until just before Whitfield filed bankruptcy. <u>See</u> <u>Exh.</u> 11; <u>Exh.</u> 12; <u>Exh.</u> 14.  Given this timeline and

---

[9]The Court may take judicial notice of the claims made in the debtor's objection since these claims, whether or not they
are true, are docketed in the BR. Claims Register and "can be accurately and readily determined from sources whose
accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b) (2).

the invoices from Stern & Eisenberg, it is clear that the law firm incurred these attorneys' fees and legal costs as a direct result of the December foreclosure filing and related litigation over the next two years.  If, as explained above, the foreclosure was filed in violation of Act 91, then WSFS is not entitled to seek reimbursement for charges related to this invalid foreclosure and Whitfield has clearly been prejudiced by the imposition of $5,302.16[10] in attorney's fees and costs that she does not owe as a matter of law.

Whitfield also testified that the imposition of the foreclosure imposed significant emotional stress on herself and her family and that her credit score has been significantly impaired since the foreclosure was filed and is now "468" – a score noted as "poor" by Experian.  H.R. at 9:54 to 9:55 am.; see also Exh. 17 ("Credit history").  In sum, Whitfield has shown that she suffered both financial and emotional harm as a direct result of WSFS' failure, as well as suffering damage to her credit score, harm which will likely impair her ability to obtain credit in the future, including impairing her ability to rent an apartment in the future should she lose her home.

### 4. **WSFS' Duty to Send an Act 91 Notice Is Not Excused by Whitfield's Knowledge of HEMAP**

WSFS may argue that Whitfield was not prejudiced by the lack of notice because she was approved for a prior HEMAP loan in 2011[11] and reapplied for HEMAP in 2013.  Thus, WSFS's failure to send an Act 91 notice might arguably be excused because of Whitfield's actual knowledge.  However, this conclusion - excusing WSFS from complying with Act 91 -contradicts the conclusion reached in Marra v. Stocker by Pennsylvania Supreme Court when it reviewed a similar pre-foreclosure notice requirement imposed by Act 6 of 1974, Pennsylvania's other major

---

[10]Invoices provided by Stern & Eisenberg substantiated the $5,302.16 in attorneys' fees and legal costs. However, the "invoiced" $5,302.16 does not match the $5,762.47 in "prepetition fees due" included in the proof of claim. See Exh. 8 (WSFS P.O.C. #9-1). WSFS has offered no evidence to substantiate the difference of $460.31.

[11]Since the Court raised this "one-bite-of-the-apple" question at the hearing, it is worth noting that Whitfield's prior approval for a HEMAP loan in 2011 does not bar her from reapplying for a second loan from PHFA in 2013. Nothing in the exceptions to Act 91 prohibit a borrower from applying for a 2d HEMAP loan. See 35 P.S. § 1680.401c (a) (1) – (7).  Nor does any other section of Act 91 or the related regulations. See 35 P.S. § 1680.401c et seq.;12 Pa. Code § 31.202 ("Eligibility for mortgage loan assistance").

foreclosure law. Rather than excusing WSFS, the bankruptcy court should adopt the reasoning used by the Pennsylvania Supreme Court and apply it to Act 91.

In <u>Marra v. Stocker</u>, 532 Pa. 187, 615 A.2d 326 (Pa. 1992), the Pennsylvania Supreme Court addressed the effects of a lender's failure to comply with the notice requirements of Pennsylvania's *other* major foreclosure law: Act 6 of 1974. 41 P.S. § 403. In that case, the trial court had excused the foreclosing Bank's failure to send the notice required by Act 6 to the Marras. <u>See</u> <u>Marra v. Stocker</u>, 532 Pa. at 190-91. Although the Marras qualified as "residential mortgage debtors" covered by Act 6, the trial court excused the Bank's failure to send an Act 6 notice to them on the basis that the foreclosure complaint itself gave the Marras actual notice of the foreclosure and "technical compliance" with Act 6 was not required since the default involved was "non-monetary". <u>See</u> <u>Marra</u>, 532 Pa. at 191-92.  The Superior Court affirmed and the Marras appealed. <u>See</u> 532 Pa. at 191.

The Pennsylvania Supreme Court reversed the lower courts' holding for two reasons. First, citing the Pa. Statutory Construction Act, the Supreme Court found that the language of Act 6 was unambiguous and covered *all* "defaults", monetary and non-monetary.  <u>See</u> 532 Pa. at 194 (*quoting* 1 Pa.C.S. § 1921(b): "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit").  The Court held that "[t]he Bank could not deviate from the clear language of the statute, ie., pick and choose the factual scenario to which the statute would apply." <u>Id</u>. at 195.  Second, the Court held that despite the Marras having actual notice of the foreclosure action, nevertheless they had been prejudiced by the Bank's failure to provide the mandatory Act 6 notice. The Court stated, "We disagree with the lower courts that the Marras were not prejudiced because they received actual notice of the foreclosure proceedings by service of the complaint. *Prejudice to the Marras is evident in the interest, court and sheriff costs, attorneys' fees, etc., which attached upon the commencement of the mortgage foreclosure action.*" <u>Id</u>. at 194–95 (emphasis added).

The Pennsylvania Supreme Court's reasoning in <u>Marra v. Stocker</u> regarding Act 6 is applicable to the similar notice requirements in Act 91. The two statutes are analogous and the Pa. Supreme Court's analysis of Act 6 should be treated as highly persuasive, if not binding, on the bankruptcy court in reviewing Act 91. It is well-established that "in interpreting state law, federal courts are bound by the decisions of the state's highest court . . . [w]hen there is a novel question of law and no controlling precedent on the issue, courts must "predict how the highest state court would rule." <u>Seaman v. Colvin</u>, 145 F. Supp. 3d 421, 425 (E.D. Pa. 2015) (*quoting* <u>Wirth v. Aetna U.S. Healthcare</u>, 469 F.3d 305, 309 (3d Cir. 2006)).  In Whitfield's case, the Court should predict that the Pennsylvania Supreme Court would reach the same result in analyzing the notice requirements under Act 91 as it did under Act 6.

The language of Act 91 unambiguously states that "*[b]efore* any mortgagee may . . . commence any legal action including mortgage foreclosure to recover under such obligation . . . such mortgagee *shall give the mortgagor notice* as described in section 403-C [of Act 91]." 35 Pa. Stat. Ann. § 1680.402c (a) (emphasis added).  Per § 1921 (b) of the Pa. Statutory Construction Act "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). <u>See also</u> <u>Shinal v. Toms</u>, No. 31 MAP 2016, 2017 WL 2655387, at *15 (Pa. June 20, 2017) (Pa. Supreme Ct. finding that "[u]nder the rules of statutory construction, we cannot ignore the plain meaning of a statute when the words of that statute are unambiguous").

Consistent with the Pennsylvania Supreme Court's reasoning regarding Act 6 in <u>Marra v. Stocker</u>, this Court should similarly conclude that the plain language of § 1680.402c of Act 91 unambiguously requires that WSFS *must* send an Act 91 notice to Whitfield before filing any foreclosure.  Likewise, this Court should also find that whether or not Whitfield had actual knowledge of the HEMAP program or had applied for HEMAP in the past does not excuse WSFS from strict compliance with the plain language of Act 91.  Such a ruling would be consistent with

the Court's statement in Marra that "[t]he Bank could not deviate from the clear language of the

statute, ie., pick and choose the factual scenario to which the statute would apply." 532 Pa. at 195.

Similarly, WSFS may not "pick and choose the factual scenarios" in which it must send an Act 91

notice to a borrower.

Finally, this Court should also follow Marra v. Stocker, in concluding that financial

prejudice to Whitfield is self-evident in light of the $5,762.47 in attorney's fees and legal costs

"which attached upon the commencement of the mortgage foreclosure action" filed by WSFS in

2013. See Marra, 532 Pa. at 194–95.  If this Court follows Marra v. Stocker, Whitfield will clearly

have satisfied the requirement of Act 70 to show prejudice.  See 35 P.S. § 1681.5(1).

## 5. Whitfield Has Negated the Prima Facie Validity of the P.O.C.; and WSFS Has Failed to Offer Any Evidence that It Complied with the Act

Given the law and the facts stated above, Whitfield has provided substantial evidence

showing that WSFS is not legally entitled to $5,762.47 in legal charges – evidence that negates the

legal basis for the charges and that is "equal in force" to the prima facie validity of WSFS' claim for

these fees and costs. See In re Allegheny Int'l, Inc., 954 F.2d at 173–74. The evidence is more than

sufficient to negate the validity of WSFS' prima facie claim, and therefore shift the burden to WSFS

to show by a preponderance of evidence that it is entitled to the $5,762.47.  See 954 F.2d at 173–74.

WSFS has failed to meet that burden.  As explained above, the Statebridge Notice sent by WSFS

plainly fails to comply with Act 91.  See supra. At the hearing on the debtor's objection, WSFS

offered no evidence that it had sent any other notice that might comply with the Act. See Hearing

Record passim. WSFS has also failed to offer any other evidence that Act 91 does not apply or that it

is entitled to the fees despite failing to comply.  In light of WSFS' failure, per Act 70, the

"appropriate remedy" to impose in the context of an objection to a proof of claim is to disallow the

illegal fees and costs. See 35 P.S. § 1681.5.  As such, the Court should disallow the $5,762.47 in

attorneys' fees and legal costs and reduce the secured claim for arears accordingly.

**C.**    **Under The Terms of the Mortgage, Proper Notice Under Act 91 Is A Condition Precedent To Demanding Attorney's Fees.**

**1.**    **The Plain Language of the Mortgage Contract Requires WSFS to Send All Applicable Legal Notices to Whitfield Before Filing Foreclosure**

Additionally, the attorney's fees and costs should be disallowed because WSFS is not entitled to these fees under the terms of the mortgage contract itself.  The purchase-money mortgage in this case was executed on December 6, 1999 between Whitfield and the loan originator, CIT Group/Consumer Finance Inc. in consideration for a loan of $55,593.00 secured by a lien on Whitfield's home. See Exh. 1 (WSFS Mortgage).  The mortgage expressly conditions the lender's right to foreclose on the prior delivery of any notices required by law that may be applicable to the loan. Specifically, the "DEFAULT" section of the mortgage states in full:

> **DEFAULT** - If I default in paying any part of the obligation secured by this Mortgage or if I default in any other way under the Note or this Mortgage, or under any other mortgage on the Premises, you, at your option *and after the delivery of any notices required under law applicable to this Mortgage and the expiration of any time periods provided in such notices*, may declare the entire obligation secured by this Mortgage due and payable without further demand and foreclose on this Mortgage. I agree to pay a reasonable attorney's fee plus court costs. If any money is left over after you foreclose on this Mortgage it will he paid to the persons legally entitled to it, but if any money is still owing, I agree to pay you the balance.

Exh. 1 (WSFS Mortgage) (emphasis added).

Under Pennsylvania law, a mortgage, like any other contract, should be interpreted based on the plain language of the agreement. See, e.g., Philadelphia Hous. Auth. v. Dore & Assocs. Contracting, Inc., 111 F. Supp. 2d 633, 637 (E.D. Pa. 2000) (applying "Pennsylvania's rules of contractual interpretation, which look primarily to the contract's plain language to determine the parties' intent").  The Third Circuit has noted that "Pennsylvania courts apply the 'plain meaning rule' of interpretation of contracts which assumes that the intent of the parties to an instrument is 'embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement.'" Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir.1994) (internal citations omitted). A contract provision may

be deemed ambiguous "if it is susceptible of two reasonable alternative interpretations." Hullett, 38

F.3d at 111. See also Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1010 (3d Cir.

1980).

        In this case, the mortgage is unambiguous. The plain language of the "Default clause" makes

clear that the mortgagee may only demand payment in full or file a foreclosure action "*after* the

delivery of any notices required by law applicable to this Mortgage and the expiration of any time

periods provided in such notices."  See Exh. 1 (emphasis added). There is nothing ambiguous about

this language: under the plain terms of WSFS' mortgage, delivery of any required notices and

expiration of any waiting periods *is a condition precedent* to WSFS' right to demand payment in

full or file a foreclosure action.

        WSFS has proffered the mortgage originated by CIT Group/Consumer Finance as the basis

for its assertion of a secured claim.  See Exh. 8 (WSFS proof of claim). See also E.D.Pa. Bankr. Ct.

Claims Register (WSFS P.O.C. # 9-1) The proof of claim also proffers documents establishing a

chain of assignment from CIT Group to WSFS.  See WSFS P.O.C. #9-1 (WSFS' P.O.C. &

supplementary documents filed with the claim). It is black letter law that a subsequent assignee of a

contract takes the assignment subject to the same terms and obligations. "An assignment does not

modify the terms of the underlying contract. It is a separate agreement between the assignor and

the assignee which merely transfers the assignor's contract rights, leaving them in full force and

effect as to the party charged . . . the assignee simply moves into the shoes of the assignor . . .  an

assignment is intended to change only who performs an obligation, not the obligation to be

performed." Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 60 (3d Cir.

2001) (internal citations omitted).

        As the successor-in-interest to CIT Group, under the terms of the "Default Clause", WSFS

has agreed not to declare the loan in default or file a foreclosure action until all applicable notices

required by law have been delivered and any applicable waiting period had expired.  Yet, WSFS has

completely failed to satisfy this contractual obligation before it filed foreclosure in 2013. For all the reasons discussed above, the evidence shows: 1) that the mortgage is covered by Act 91 and 2) that the Statebridge Notice sent to Whitfield on July 8, 2013 fails to comply with the notice requirements of § 1680.403c of the Act.  See supra. Under the terms of its own contract, WSFS was not entitled to file a foreclosure action until it had delivered the required Act 91 notice and until at least the 33-day waiting period had passed.  Since WSFS *did not* send the Act 91 notice, it was *not* contractually entitled to file a foreclosure complaint on December 24, 2013. By extension, WSFS also is not contractually entitled to the $5,762.47 in attorney's fees and legal costs arising out of the premature foreclosure action.

### 2.  WSFS' Right to "Reasonable Attorney Fees" Must be Read in Context

The "Default clause" also states that the borrower agrees to "pay a reasonable attorney fee plus court costs." See Exh. 1.  This right to fees should be read in context, interpreted together with the other requirements that any applicable notices required by law must be sent before a foreclosure is filed. See e.g., Williams v. Metzler, 132 F.3d 937, 947 (3d Cir. 1997) ("In the process of defining the objective intent of the parties, a court must examine the entire agreement. 'A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together'") (*quoting* RESTATEMENT (SECOND) OF CONTRACTS, § 202(1)); Colorcon, Inc. v. Lewis, 792 F. Supp. 2d 786, 797 (E.D. Pa. 2011) ("In ascertaining the parties' intention, a court must read the contract as a whole ... it being necessary to consider every part thereof in order to resolve the meaning of a particular part as well as that of the whole"). Read in context, together with rest of the "Default clause", the "attorney fee" sentence merely establishes that *after* the applicable notices are sent, the lender may demand reasonable fees and costs related to a legitimate foreclosure action filed in compliance with the terms of the mortgage contract and state law.

WSFS may argue however that the "attorneys' fee" clause is a separate sentence from the rest of the "Default clause" and that it is therefore ambiguous whether or not a demand for

19

reasonable attorneys' fees is necessarily contingent on satisfying the "legal notice" requirements set out in the rest of the Default clause. This argument fails for three reasons.   First, as stated above, the "attorney's fee" provision should be read in context, together with the rest of the terms of the entire "Default clause". See Williams v. Metzler, 132 F.3d at 947; Colorcon, Inc., 792 F. Supp. 2d at 797. Second, the plain language of the provision requires that the fees and costs demanded be "reasonable".  If nothing else, 'reasonableness' should be equated with the parties' compliance with the terms of the mortgage, i.e., it is per se unreasonable to violate the terms of a contact but then demand related fees under the same contract.  Thus, the 2013 foreclosure filed in violation of the "Default clause" is per se 'unreasonable' and any related fees and costs must also be unreasonable.

Third, even if the Court finds that the relationship between the "attorneys' fee" provision and the rest of the "Default clause" is ambiguous, any ambiguity in the contract should be interpreted in Whitfield's favor and against WSFS as successor-in-interest to, CIT Group, the party who drafted the mortgage. See, e.g., In re 400 Walnut Assocs. LP, 454 B.R. 601, 606 (Bankr. E.D. Pa. 2011) (Under Pennsylvania law, "[i]t is a well-settled principle of contract construction that terms are construed *contraproferentum,* that is against the drafter") (Raslavich, J.); Husak v. Berkel, Inc., 234 Pa. Super. 452, 460, 341 A.2d 174, 178 (Pa.Super.1975) ("where the intention of the contracting parties is not clear due to an ambiguous expression in the written instrument, the writing is construed most strongly against the party drafting it"); Egyptian Sands Real Estate, Inc. v. Polony, 222 Pa. Super. 315, 320, 294 A.2d 799, 803 (Pa.Super.1972) ("Under general contract rules, a promise . . . if ambiguous, it will be construed *Contra proferentum*, against the party having drafted it").

Viewed in this light, any ambiguity between the terms should be resolved in Whitfield's favor by reading the two relevant sentences in the "Default clause" together and reaching the following conclusions regarding the mortgage. First, the Court should find that under the terms of the "Default Clause", the "prior legal notice" provisions must be satisfied before WSFS can

file a *contractually valid* foreclosure action.  Second, the Court should find that attorney fees and

legal costs may only be demanded once the applicable notices have been delivered and a

contractually valid foreclosure is filed.  Third, the Court should find that attorney fees or legal

costs demanded before such notices are sent or before a valid foreclosure is filed are  per se

unreasonable since these fees and costs are demanded contrary to the terms of the mortgage.

Given these facts, whether the Court views the "Default clause" as ambiguous or

unambiguous, the result is the same: either way WSFS is not contractually entitled to the

$5,762.47 in attorney's fees. The remedy for this breach of contract is for the court to disallow

the $5,762.47 demanded and reduce the amount of WSFS' claim for arrears accordingly.  WSFS

may claim that such an award for damages for a breach of contract cannot be properly raised in

an objection to a proof of claim, and that instead the debtor should have filed an adversary

proceeding to seek $5,762.47 in actual damages to be set off against WSFS' secured claim.

However, such a conclusion is contrary to the Bankruptcy Code.  Section 502 (b) (1) of the Code

provides that:

> **(a)** A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

> **(b)** Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, *the court, after notice and a hearing, shall determine the amount of such claim* in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, e*xcept to the extent that--*

> **(1)** *such claim is unenforceable* against the debtor and property of the debtor, *under any agreement or applicable law* for a reason other than because such claim is contingent or unmatured;

11 U.S.C.A. § 502 ("Allowance of Claims or Interest") (emphasis added).

The plain language of Section 502(b)(1) makes it clear that if an objection to a proof of

claim is filed, after a hearing, the Court shall determine the amount of the claim and shall allow

such a claim "except to the extent that  . . . such a claim is unenforceable . . .  under any agreement

or applicable law…" § 502(b) (1).  See also In re Milbourne, 557 B.R. 376, 388 (Bankr. E.D. Pa.

2016) ("a proof of claim shall be allowed only to the extent that a claimant is entitled to such claim

based upon 'the underlying substantive law creating the debtor's obligation' . . . . [f]urthermore,

with regard to any objection to a proof of claim, 'any defense to a claim that is available outside of

the bankruptcy context is also available in bankruptcy.'") (internal citations omitted). Whitfield has

a defense of breach of contract based on WSFS' failure to send her the applicable prior notice

(under Act 91) as a condition precedent to filing a foreclosure in 2013. Pursuant to § 502(a)(1) of

the Code, this same defense can be raised inside her bankruptcy as an objection that the claim for

attorneys' fees and legal costs is unenforceable under the terms of her agreement. The only

difference is that, rather than awarding damages, the Court should disallow the claim "to the extent

that such a claim is unenforceable … under any agreement . . ." § 502(a) (1).  Moreover, unlike

under Act 91, Section 502 does not require the debtor to show that she suffered "prejudice"[12] in

order to make out her claim that WSFS has failed to comply with the terms of the mortgage.

### 3.  Whitfield Has Negated the Prima Facie Validity of the P.O.C.; and WSFS Has Failed to Offer Any Evidence that It Complied with the Mortgage Contract

Given these facts, Whitfield has satisfied the burden of production.  She has provided

substantial evidence showing that WSFS is not contractually entitled to the attorneys' fees and costs

under the terms of the mortgage – evidence that is "equal in force" to the prima facie validity of

WSFS' claim and which also negates the legal basis for its claim to $5,762.47. See In re Allegheny

Int'l, Inc., 954 F.2d at 173–74.  The debtor's evidence is more than sufficient to overcome the prima

facie validity of WSFS' claim that the fees are contractually due. See id. This shifts the burden to

WSFS to show by a preponderance of evidence that it either complied with the pre-foreclosure notice

requirements set out in the "Default clause" or that the charges are still legally due despite its failure

to comply.  See id. WSFS has failed to meet that burden.

---

[12] See discussion of Act 70's requirement to show prejudice, *supra*.

As explained above, the Statebridge Notice sent by WSFS plainly fails to comply with Act 91. See supra. This failure to comply with Act 91, an "applicable notice" necessarily demonstrates that WSFS also failed to comply with the "Default Clause". At the hearing on the debtor's objection, WSFS offered no contrary evidence that it had sent any other "applicable notices" that might comply with Act 91 or with the mortgage. See Hearing Record passim. Nor does the discovery provided by WSFS offer any such notices. See Exh. 11 & Exh. 12. WSFS has failed to show by a preponderance of the evidence that it did, in fact, comply with the terms of its own mortgage agreement. In light of this failure, pursuant to § 502, the Court should disallow the $5,762.47 in attorneys' fees and legal costs and reduce the secured claim for arrears accordingly.

## D.    **WSFS Has Failed to Show that $3,217.17 in Hazard Insurance Premiums are Credible or Actually Incurred**

### 1.    **WSFS Has Substantiated its Demand for Property Taxes But Not for the $3,217.17 Demanded for Insurance Premiums**

The record in this case provides substantial evidence that the $3,217.17 in hazard insurance premiums included in WSFS' proof of claim are neither reasonable nor actually incurred by the lender. In contrast, WSFS has offered only a single document: a "Loan Payment Summary" - unauthenticated hearsay evidence – as proof that these premiums where actually incurred, and even that evidence is contradictory and not credible.

WSFS's proof of claim includes a demand for $7,837.11 labeled "Escrow deficiency for funds advanced". See Exhibit 8 (WSFS POC # 9-1). After the Court partially granted Whitfield's motion to compel production of documents on April 27, 2017, WSFS produced a breakdown of this escrow deficiency showing that it consists mostly[13] of: 1) $674.24 in late charges, 2) $3,217.17 in fees for "escrow – insurance" and 3) $3,908.87 in fees for "escrow – RE taxes." See Exh. 12 (WSFS Supplemental discovery response). WSFS's response also included copies of "Real Estate

---

[13] "$0.14" listed as "escrow" remains unexplained. See "Exh. 12".

Tax Receipt[s]" from the City of Philadelphia Department of Revenue as evidence of actual

payment to the City of Philadelphia of the $3,908.97 included in the proof of claim for real estate

taxes. See Exh. 12. In light of this evidence, Whitfield does not dispute the amount of $3,908.97

demanded for real estate taxes in the claim for arrears. Nor does Whitfield dispute the demand for

$674.24 in late fees included in the claim for arrears. See Exh. 12.

However, WSFS has provided *no* similar evidence supporting its demand for $3,217.17 for

"escrow – insurance" payments. Despite the Court's order, WSFS' discovery responses provided

*no* receipts, *no* bills, *no* invoices, *no* copies of checks nor any other records as proof of payments

actually made to an insurance underwriter for the $3,217.17. See Exh. 11 & Exh.12.

At the hearing on the Debtor's objection on June 26, Levi Phillips, a paralegal at Community

Legal Services, Inc., testified that he had reviewed in detail both: 1) the documents provided by

WSFS in response to Whitfield's original Request for Documents (Exh. 11); and 2) the documents

provided by WSFS as a supplemental response (Exh. 12). H.R. at 10:22 to 10:24 am.; 11:03 a.m.

Phillips testified that the discovery response contained invoices from the law firm of Stern &

Eisenberg, P.C. for most of the attorney's fees demanded in the proof of claim as well as copies of

receipts substantiating the payment of $3,908.97 to the City of Philadelphia for real estate taxes.

H.R. at 10:22 to 10:24 am. Based on this information Phillips testified that he created an accurate

table of the Attorney's Fees and Costs which were corroborated by an invoice. H.R. at 10:24 to

10:25 a.m.; 10:57 a.m.; 11:08 a.m. See also Exh. 14 (Table of "Attorney's Fees and Costs with

Invoice").

Phillips also testified that he created an accurate table of the Attorney's Fees and Costs that

were *not* corroborated by an invoice. H.R. at 10:26 to 10:28 a.m.; 10:59 a.m. See also Exh. 15

(Table of "Attorney's Fees and Costs without Invoice"). Phillips also testified that, in contrast,

neither set of discovery responses included copies of any receipts, bills, invoices, checks nor any

other records as proof of $3,217.17 in payments actually made to an insurance company. H.R. at

10:40 to 10:41 a.m.; 11:05 a.m. His testimony is corroborated by WSFS' discovery responses

themselves, which contain no such invoices, receipts, bills or checks.  See Exh. 11 and Exh. 12.

The *only* evidence offered by WSFS as proof of any actual payments to an insurance

company are eleven charges for "hazard insurance" listed in the "Loan History Summary" included

in WSFS's initial discovery response.  See Exh. 11, pp. CW-012 to CW-028 ("Loan Summary").

At the hearing, Phillips testified that he had reviewed the Loan Summary and compiled an accurate

and complete table of all eleven of the alleged charges for hazard insurance premiums included in

the Summary. H.R. at 10:38 to 10:40 a.m.  The chart of "insurance payments from payment history"

shows that Whitfield's account was charged eleven times for hazard insurance between January 31,

2014 and March 29, 2016.  See Exh. 16 (Table of "Total of Insurance Payments from Payment

History").   The payee listed was either "Seattle Specialty Insurances Services" or "Scottsdale

Insurance Company" and the premiums charged total $3,217.17. See Exh. 16.

### 2.  The Loan History Summary Is Not Accurate, Credible or Admissible

#### a.  The Summary is not accurate because it fails to credit an $867 refund

The Court should give the Loan Summary little evidentiary weight since the Summary

undermines WSFS's demand for $3,217.17 for three reasons.  First, the Summary itself shows that

WSFS's demand for a total of $3,217.17 is facially inaccurate because WSFS failed to credit

Whitfield with a refund of $867.67 against the total.  WSFS demands payment of $3,217.17 as

reimbursement for insurance premiums it allegedly paid.  See Exh. 11, pp. CW-012 to CW-028;

Exh. 16 (chart of "Total of Ins. Payments"). The largest portion of this is a single premium payment

of $2,283.56 to "Scottsdale Insurance Company" on March 31, 2014.  See Exh. 11, pp. CW-023;

see also Exh. 16.

However, the Loan Summary also reflects *that WSFS received an insurance refund of*

*$867.67 just one month later on April 30, 2014.  See* Exh. 11, pp. CW-022 ["Insurance Refund"]. In

compiling its proof of claim, WSFS clearly totaled all of the payments listed on the Loan Summary

25

as allegedly disbursed to the two insurance companies. See Exh. 16 (Table of insurance charges).

Yet, WSFS failed to note that the same record shows that it received an $867.67 insurance refund.

WSFS did not properly credit Whitfield with this $867.67 before demanding $3,217.17 in its proof

of claim. Additionally, two of the charges for $54.89 in premiums are dated "2/22/2016" and

"3/29/2016". See Exh. 16. These two charges totaling $109.78 should not have been included in the

proof of claim since they are for *post-petition* amounts only due *after* Whitfield filed bankruptcy on

February 3, 2016.

       Thus, the Loan Summary itself - the *only* evidence offered by WSFS of any insurance

premiums paid - contradicts the proof of claim and shows that WSFS' demand for $3,217.17 is not

accurate.  At a minimum, this demonstrates that WSFS is entitled to no more than $2,239.72[14].

More importantly, this defect demonstrates that WSFS' demand for $3,217.17 is not accurate or

credible.

      **b.**  **The Loan Summary is not credible because the insurance premiums paid
vary wildly and WSFS' offered no evidence to explain or corroborate the
amounts paid**

       Second, the premiums listed in the Loan Summary are inconsistent because they show that

Whitfield's monthly premium for hazard insurance varied between $54.89 per month a majority of

the time but inexplicable spiked up to *$2,283.56* on March 31, 2014 and then returned to $54.95 per

month in 2015.  See Exh. 11, pp. CW-023; see also Exh. 16. The Court might conclude that

approximately $55.00 per month[15] is a reasonable monthly premium for hazard insurance on a

residential property with a fair market value of $112,000.00, according to the City of Philadelphia's

tax assessment records.  However, the $2,283.56 allegedly paid to Scottsdale Insurance on March

31, 2014 is the equivalent of more than forty months of the $55 per month insurance premiums paid

to Specialty Insurance Service.  WSFS has offered no explanation why Whitfield's insurance

premiums should cost $55 per month, then suddenly skyrocket to over $2,283 dollars a month later

---

[14] $3,217.17 - $867.67 - $109.78 = $2,239.72.
[15] Resulting in an annual cost of $660 per year for hazard insurance.

and drop back to $55 per month just one year later. At the hearing, WSFS offered no testimony to explain this variation in premiums.  Nor do any of the documents produced offer any explanation.  See Exh. 11 & Exh. 12.

The Court may suspect that this $2,283.56 disbursal, if made, reflects a higher annual premium for forced-placed insurance.  However, the Court should note that this inference still would not explain why forced-placed insurance from one underwriter should cost $660 per year but the same type of insurance cost $2,283 per year for another agency.  Thus, even if the insurance was forced-placed by two different companies, the contrast between the two shows that the $2,283 premium charged by Scottsdale Insurance is unreasonable in comparison with the $660 premium charged by Seattle Specialty.   Additionally, whatever it suspects, the Court should not forget that WSFS has offered absolutely no evidence which corroborates the Loan Summary's statement that these payments were made; and no evidence at all (not even in the Summary) which establishes that these premiums were for forced-placed insurance. At a minimum, this demonstrates that the payment of $2,283.56 should be disallowed. More importantly, in light of the unreasonable variation in premiums and the lack of any corroborating evidence to bolster the Loan Summary, the Court should find that the Summary has little evidentiary weight and is not credible.

### c.   The Court has recognized that the Loan Summary is not admissible as substantive proof of the $3,217.17 in premiums

Third, the Loan History Summary is unauthenticated hearsay and the Court should not treat it as evidence of the substantive fact that these insurance premiums were actually paid.  At the conclusion of the hearing on June 26, the Court specifically recognized that the discovery provided by WSFS (Exh. 11 & Exh. 12), which includes the Loan Summary, was not being admitted to substantiate "the truth of the matters" therein. H.R. at 11:12 a.m. Thus, the Loan Summary cannot be used to establish the factual truth of the $3,217.17 in premiums and whether or not they were actually paid.

The Summary is an out-of-court statement offered by WSFS to establish the truth of the alleged fact that the insurance premiums were incurred and paid. As such, the Summary is "Hearsay" prohibited by Federal Rule of Evidence 802 ["Rule against Hearsay"].   Additionally, the Loan Summary is not certified or otherwise "self-authenticating. See Fed. Rule Evid. 902. ["Evidence That Is Self-Authenticating"]. At the hearing on June 26, WSFS provided no witness with personal knowledge, or any other qualified witness that Whitfield could have cross-examined, who could have authenticated the Loan Summary as required by Federal Rule of Evidence 901 ["Authenticating or Identifying Evidence"].   Nor did WSFS offer a custodian of records or any other qualified witness who could establish that the Summary was a "record of a regularly conducted activity" or "business record" exempted from the prohibition against hearsay pursuant to Federal Rule of Evidence 803(6). See F.R.E. 803 (6).   In light of WSFS' failures, the Court should decline to accept the Loan Summary as evidence of the truth of the payments.   See Ezeagwuna v. Ashcroft, 325 F.3d 396, 406 (3d Cir. 2003) ("Hearsay is generally inadmissible because the statement is inherently untrustworthy: the declarant may not have been under oath at the time of the statement, his or her credibility cannot be evaluated at trial, and he or she cannot be cross-examined").

At the conclusion of the Hearing on June 26, counsel for Whitfield objected that the documents produced by WSFS (Exh. 11 & 12) should *not* be admitted as evidence of the truth of fact of any payments.   In a colloquy with the Court, Whitfield's attorney asked that the Court not allow Exhibits 11 and 12 (which include the Loan Summary) into evidence as proof of the substantive facts or truth of payments but only as evidence of the basis for Mr. Phillip's analysis and the source of the information contained in Tables, Exhibits 14 to 16. H.R. at 11:11 to 11:12 a.m. The Court responded that it understood that Exhibits 11 and 12 were not being offered for the truth of the matters contained therein and admitted these two Exhibits into evidence on that limited non-substantive basis.   H.R. at 11:12 a.m.   Counsel for WSFS did not object to this limitation. H.R. at

28

11:11 to 11:12 a.m. Such a limitation on the admissibility of evidence is permitted by Fed. Rule of

Evidence 105 ["Limiting Evidence"]. In light of this ruling, the Loan Summary has been properly

excluded by the Court as hearsay. It cannot be offered to substantiate WSFS' claim that it is entitled

to $3,217.17 in insurance premiums.

If it nevertheless considers the Loan Summary as evidence, the Court should significantly

reduce the evidentiary weight given to it in light of WSFS' failure to provide a witness to

authenticate the Loan Summary or satisfy all the requirements of F.R.E. 803(6) and F.R.E. 901.

Furthermore, in light of WSFS's failure to provide any underlying bills or invoices corroborating

the Loan Summary, the Court should significantly reduce the value or evidentiary weight given to

the Summary. See Bailey v. Astrue, No. CIV.A. 07-4595, 2009 WL 577455, at *11 n.5 (E.D. Pa.

Mar. 4, 2009) ("[u]ncorroborated hearsay untested by cross-examination does not by itself

constitute 'substantial evidence.' "). See also Henley v. United States, 379 F. Supp. 1044, 1051–52

(M.D. Pa. 1974) ("mere uncorroborated hearsay or rumor does not constitute substantial evidence");

Unemployment Comp. Bd. of Review v. Hilton Hotels Corp., 28 Pa. Cmwlth. 291, 294, 368 A.2d

855, 857 (1977) ("uncorroborated hearsay is not, as a matter of law, substantial evidence, but taken

together with any competent corroborative evidence, such evidence may constitute substantial

evidence"). As discussed above, WSFS has clearly failed to provide a witness to cross-examine or

any testimony or documentary evidence that corroborates the Loan Summary list of the eleven

payments to the insurance companies. See supra. In light of this failure, the Court should treat the

unsubstantiated statements in the Summary as less than "substantial evidence" that these payments

were made and far less than proof by a preponderance of the evidence. At best, the Loan Summary

offers only a 'mere scintilla' of evidence of payment. See Brown, 845 F.2d at 1213 (the standard for

'substantial evidence' is more than for a 'mere scintilla' of evidence); Green, 179 F. Supp. at 484

(same).

### 3. WSFS' Inconsistent Records & Failure to Respond to the Court's Order to Produce Documents Further Undermines its Claim for $3,217.17

As discussed earlier, the discovery provided by WSFS includes no bills, invoices or checks as proof of any actual payments of the $3,217.17 to either Seattle Specialty Insurance Services or Scottsdale Insurance Company. This lack of any invoices or checks as 'first-hand' evidence of actual payments to the two insurance companies seriously undermines the credibility of WSFS' claim for reimbursement of $3,217.17. The credibility of WSFS' claim is further undermined by WSFS own inconsistent record keeping.  The Court should note that WSFS *was* able to provide bills and invoices substantiating the $5,302.16 in attorneys' fees it actually incurred, demonstrating that WSFS has a policy of retaining payment records and past invoices. See Exh. 11. However, WSFS was not able to provide the same kind of proof substantiating the $3,217.17 in premiums it allegedly paid. Yet, it has offered no explanation for why it kept one set of invoices (including some for as little as $50.00) but not others for bills totaling over $3,000.00.

Furthermore, WSFS failed to provide any invoices or bills substantiating the $3,217.17 even after the Court issued an order compelling the lender to produce all invoices related to its demand for these fees and costs.  (See Order Entered 4/27/17; Docket No. 114). This failure to comply with court-ordered discovery should have consequences.  See, e.g., Fed. R. Civ. P. 37 ["Failure to Make Disclosures or to Cooperate in Discovery; Sanctions"]. For example, once a party fails to produce records in discovery, the Court may infer that the records do not exist. See, e.g., In re Gray, No. 14-11851(SMB), 2016 WL 1039559, at *4 (Bankr. S.D.N.Y. Mar. 15, 2016) ("the failure to produce records during discovery raises the inference that the [party] has failed to maintain appropriate records, but the inference may be rebutted by the subsequent production of the records").  Once a party seeking discovery demonstrates the "absence or the inadequacy of the [respondent's] records, the burden of going forward shifts to the [other party] to justify his failure" to preserve or keep those records. See id.  Whitfield has demonstrated the absence and inadequacy of WSFS' records regarding the $3,217.17. See Exh. 11 & Exh. 12. The burden shifts to WSFS to either produce the

insurance invoices or justify its failure. See, e.g., In re Gray, 2016 WL 1039559 at *4. However, WSFS has neither produced any such records nor offered any testimony justifying its failure. See Hearing Record *passim*. As such, the Court should infer that the records of the premium payments do not exist. See id. In addition, in light of WSFS' failure to comply with the discovery order, the Court should also significantly reduce the weight it gives to the Loan Summary as credible evidence that the $3,217.17 was actually incurred.

### 4. Under The Standard Set By Allegheny Int., The $3,217 In Premiums Should Be Disallowed By The Court

Whitfield has more than met her burden of providing substantial evidence that is "equal in force" to the prima facie validity of WSFS's demand for $3,217.17 in hazard insurance premiums. First, the discovery obtained by Whitfield plainly shows that WSFS cannot produce a single bill or check establishing first-hand that any payments were made to either Seattle Specialty Services or Scottsdale Insurance. See Exh. 11 and Exh. 12) Second, Whitfield has demonstrated that the Loan Summary, *the only evidence offered by WSFS* as proof that the premiums were actually paid is inaccurate, not credible and inadmissible. Third, the Court has ruled that the Loan Summary is not admitted as proof of any substantive fact. Fourth, Whitfield has shown that WSFS' record keeping is inconsistent; and that WSFS failed to produce any proof that might corroborate the Loan Summary even after being ordered to do so by this Court.  See *supra*.

Taken together, this evidence is more than "equal in force" to the validity of WSFS' prima facie claim for $3,217.17. See In re Allegheny Int'l, Inc., 954 F.2d at 173–74. The evidence is far more than sufficient to "refute ….the claim's legal sufficiency" and "to negate one or more of the sworn facts in the proof of claim" Id. Having met the burden of production, "the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence" See id.  The burden of proof by a preponderance of the evidence "requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." Syblis, 763 F.3d at 357. Proof by a

preponderance requires more than 'substantial evidence' and significantly more than a 'mere

scintilla' of evidence. See Brown v. Bowen, 845 F.2d at 1213; Green v. Colvin, 179 F. Supp. 3d at

484 (same). If the evidence is evenly balanced "[t]he party bearing the burden of persuasion must

lose if the evidence is evenly balanced." Washington v. Hovensa LLC, 652 F.3d at 345 n.2.

WSFS has failed to meet this burden.  As already discussed above, WSFS has failed to offer

any 'first-hand' documentary evidence.  It offered no receipts, bills or checks payable to Seattle

Specialty Insurance Services or Scottsdale Insurance as proof of actual evidence of payment. See

Exh. 11 and Exh. 12.  At the hearing, WSFS called no witnesses to substantiate this demand: no one

from its own corporate office, or from the current servicing agent, BSI Servicing; or from the prior

servicer, Statebridge Company. See Hearing Record passim. The only evidence that WSFS offered

as proof of payment is the Loan Summary. See Ex 12.   Thus, WSFS's entire demand for $3,217.17

rests on whether the Court finds that the Loan Summary alone proves by a preponderance of the

evidence that the premiums were actually paid and any insurance actually provided. Yet the Court

ruled that the Loan Summary, as part of the discovery, was not admitted "for the truth of the matter"

i.e., as evidence of substantive fact. Thus, the Loan Summary cannot be offered "for the truth of the

matter" to substantiate WSFS's claim for $3,217.17.

For all the reasons already discussed above, the Court should not find that the Loan

Summary meets this standard: (i) the lack of any 'first-hand' evidence, such as checks or invoices,

to corroborate the Loan Summary; (ii) the Loan Summary's inaccuracy, lack of credibility and

inadmissibility; (iii) the Court's ruling that the discovery was not admitted for the "truth of the

matter"; (iv) WSFS' inconsistent records and (v) its failure to comply with the Court's discovery

order.  All of these factors show that, at best, the Loan Summary offers only the merest scintilla of

evidence that the premiums were paid. Viewed properly, the Loan Summary has been excluded as

evidence of fact, and WSFS has therefore offered no substantive evidence to support its claim for

$3,217.17. In light of this evidence, WSFS has clearly failed to satisfy its burden to show by a

preponderance that the $3,217.17 in premiums were ever actually incurred or paid. Consistent with

<u>Allegheny International</u>, the Court should correspondingly reduce WSFS's claim for arrears by

$3,217.17.

### IV. CONCLUSION

WHEREFORE, for all the reasons stated above, the Debtor asks that the Court grant her

motion disallowing the proof of claim for arrears as filed by WSFS and reducing the amount of

its allowed secured claim for arrears (P.O.C. #9-1) by a total of $8,974.64.

Respectfully submitted,

<u>/s/  Montgomery L. Wilson</u>
MONTGOMERY L. WILSON, ESQ.
Pa. Attorney I.D. # 88009
Attorney for Debtor Carolyn Whitfield
Community Legal Services, Inc.
1410 W. Erie Avenue
Philadelphia, PA  19140
Tel: 215-227-2400
Fax: 215-227-2435
mwilson@clsphila.org

Date:   <u>August 4, 2017</u>