## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

IN RE:                                          :          **Chapter 13**
                                                :
    **CAROLYN D. WHITFIELD,**          :
                                                :          **Bky. No. 16-10709 ELF**
       **Debtor.**                 :
_____        :

# O P I N I O N

## I.  INTRODUCTION

Presently before the court is the objection ("the Objection") of Debtor Carolyn Whitfield ("the Debtor") to the proof of claim filed by Wilmington Savings Fund Society ("WSFS") for prepetition arrears on a mortgage loan secured by her residence.

WSFS's prepetition arrears claim is for $29,972.28.  The Debtor objects to the claim, primarily on the ground that $3,217.17 for certain escrow advances and $5,762.47 for pre-petition legal expenses are unreasonable, not due under applicable law, or not actually expended by WSFS.   The Debtor requests that WSFS's allowed claim for prepetition arrears be reduced to $20,992.64.

The Objection will be sustained in part, and denied in part.  The escrow advances component of the claim will be disallowed in large part.  The legal expenses component of the claim will be disallowed in its entirety.  As a result, WSFS's allowed claim for mortgage arrears will be reduced by $8,126.13 from $29,972.28 to $21,846.15.[1]

---

[1]     The Debtor also asserts that $34.90 in duplicative charges for inspection fees should be disallowed.  I will not further discuss this modest component of the Debtor's Objection in this Opinion, but based on my review of the records in evidence, I agree with the Debtor that WSFS failed to prove the validity of these charges.  Therefore, the $34.90 that is double charged will be disallowed.  I have included this disallowance in calculating the allowed claim for arrears stated above.

## II. PROCEDURAL HISTORY

The Debtor filed a chapter 13 bankruptcy petition on February 2, 2016.  WSFS filed a secured proof of claim for $108,396.58, with arrears of $29,972.28 on June 30, 2016.  (Claim No. 9-1).  The Debtor filed the Objection on August 9, 2016.  (Doc. #48).

A hearing on the Objection was held and concluded on June 26, 2017.[2]  The Debtor testified, as did a paralegal employed by Debtor's counsel.  (Audio Transcript of Hearing at 0:01-2:08, Doc #152) (hereafter, "A.T. at [timecode]").  The parties entered a number of exhibits into evidence.

Following the hearing, the parties submitted post-trial memoranda, the last of which was filed on August 23, 2017.  (Doc. #'s 149, 151, 154).

## III. FACTS

The facts in this contested matter are largely undisputed.

The Debtor resides at 1627 W. Nedro Ave. Philadelphia, PA.  On December 6, 1999, she entered into a thirty (30) year adjustable interest rate mortgage loan transaction with WSFS's predecessor in interest, with an initial principal balance of $55,593.00, an initial interest rate of 10.45%, a maximum interest rate of 15.95% and an initial monthly payment for principal and interest of $506.45. (See Claim No. 9-1). The note obligates the Debtor to maintain property insurance in an amount required by the lender, with the lender as loss payee. Id.

---

[2]      The delay between the filing of the Objection and the hearing date is largely attributable to the parties' good faith request that the litigation be deferred while they attempted to settle the matter through a loan modification.  In the end, however, WSFS denied the Debtor's loan modification request.

2

The mortgage authorizes the lender to purchase and pay for property insurance if the

Debtor fails to do so.  The mortgage also authorizes the lender to assess a reasonable attorney's

fee plus court costs if the Debtor defaults in paying any obligation secured by the mortgage:

> If I default in paying any part of the obligation secured by this Mortgage or if I default in any other way under the Note or this Mortgage, or under any other mortgage on the Premises, **you**, at your option **and after delivery of any notices required under law applicable to this Mortgage** and the expiration of any time period provided in such notices, **may** declare the entire obligation secured by this Mortgage due and payable without further demand and **foreclose** on this mortgage.  **I agree to pay a reasonable attorney's fee plus court costs**.

(Ex. 1) (emphasis added).

By agreement effective May 9, 2007, the Debtor and EMC Mortgage Corporation entered

into a loan modification agreement ("the LMA"). [3]  (Ex. 3).  Under the LMA, an agreed upon

amount of accrued interest, late charges, advances for taxes and insurance and legal expenses

were capitalized resulting in a "new" principal balance of $86,784.20.  The LMA extended the

maturity date of the loan to May 6, 2037, with a fixed interest rate of 7% and monthly payments

for principal and interest of $577.85.  (Id.). [4]

On June 30, 2011, the Debtor received a mortgage assistance loan of $12,500.00 from the

Pennsylvania Housing Finance Agency ("PHFA") through a program known as the

---

[3]      Presumably, EMC Mortgage Corporation was the holder of the note and mortgage holder at that time.  The Debtor does not question WSFS's status as the current holder.

[4]      Appended to the LMA in Exhibit 3 appears to be a second Loan Modification Agreement the Debtor entered into with EMC with an effective of July 24, 2008.  According to this later modification, the new unpaid principal balance was $89,703.34, the interest rate was five percent (5%) and the maturity date would be September 6, 2038.  Thus, there may have been a second loan modification, further lowering the interest rate on the loan.  However, the appended document is not signed by EMC.  The existence of this possible second loan modification does not affect the issues raised in the Objection.

Pennsylvania's Homeowner's Emergency Mortgage Assistance Program ("HEMAP"), 35 P.S. §1680.401c et seq.  See (Ex. 9).

Thereafter, the Debtor defaulted on the mortgage loan presently held by WSFS.  In its proof of claim, WSFS identifies February 2013 as the date of the Debtor's default.

As stated earlier, WSFS' proof of claim lists the prepetition arrears as $29,972.28, including:

- $16,372.70 in unpaid principal and interest payments;

- $7,837.11 in escrow advances; and

- $5,762.47 in pre-petition legal expenses.

Prior to the commencement of the bankruptcy case, WSFS initiated an action in mortgage foreclosure against the Debtor in the Court of Common Pleas, Philadelphia County.  (Ex. 6) (foreclosure complaint filed December 24, 2013).  Before doing so, on July 8, 2013,WSFS sent the Debtor a pre-foreclosure notice of intent to foreclose.  (Ex. 5).  WSFS did not provide the Debtor with a notice advising her of her right to apply for mortgage assistance under the HEMAP program.

In the foreclosure action, the Debtor participated in the state court's mortgage diversion process.  As a result, the Debtor applied for another loan modification. That application was denied.  Then, in 2014, she applied for another HEMAP loan, despite the fact that she did not receive a notice of her right to apply for HEMAP benefits.  That application also was denied. (A.T. at 1:59-2:04).  The record does not reveal the precise reason for PHFA's denial of the Debtor's 2014 HEMAP application.

Having exhausted her other options for saving her home, the Debtor filed this chapter 13 bankruptcy case on February 2, 2016.

4

## IV. LEGAL STANDARD:
## THE SHIFTING BURDENS IN CLAIMS OBJECTIONS CONTESTED MATTERS

A proof of claim filed in compliance with the Federal Rules of Bankruptcy Procedure is deemed allowed unless a party in interest objects.  11 U.S.C. §502(a).  If a party in interest objects, the court shall disallow any portion of a claim which is "unenforceable against the debtor and property of the debtor's estate under any agreement or applicable law  . . . ."  11 U.S.C. §502(b)(1).

Bankruptcy courts resolve objections to proofs of claim by employing a "burden shifting" analysis.

A claim filed in accordance with Bankruptcy Rule 3001 establishes a prima facie case for the allowance of a claim, as well as sworn evidence of the claim.  E.g., In re Sacko, 394 B.R. 90, 97 (Bankr. E.D. Pa. 2008); see also In re O'Brien, 440 B.R. 654, 664 & n.14-15 (Bankr. E.D. Pa. 2010).

To puncture that prima facie case, the objector has the initial burden of production:

> [T]he objector must produce evidence which, if believed, would refute at least one of the allegations that are essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.

In re Allegheny Int'l, Inc., 954 F.2d 167, 173–74 (3d Cir. 1992).

The evidence needed to challenge the validity or amount of a proof of claim may be within the exclusive control of the creditor, compelling the objector to issue discovery requests in order to obtain the evidence necessary to meet the initial burden of production.  In some circumstances, that burden may be satisfied if the claimant fails to respond or responds inadequately to the objector's formal or informal discovery requests.  See Sacko, 394 B.R. at

5

100-01; see also In re Campbell, 336 B.R. 430, 436 (9th Cir. B.A.P. 2005); In re Wells, 407 B.R.

873, 882 (Bankr. N.D. Ohio 2009).  However accomplished, if the objector satisfies the initial

burden of production and overcomes the claimant's prima facie case, the ultimate burden of

proof rests with the claimant.  Allegheny Int'l, 954 F.2d at 173.[5]

 The Objection before me has two (2) components, requests for: (1) disallowance of

$3,217.17 of the $7,837.11 in escrow advances that are attributable to forced placed insurance

("FPI") and (2) disallowance of the entire $5,762.47 claimed for legal expenses. [6]

 I will address each component separately.

## V. ESCROW ADVANCES FOR FORCED PLACED INSURANCE

 The Debtor asserts that WSFS has not satisfied its burden of proving that $3,217.17 in

FPI premiums were actually expended.  As explained below, I agree and therefore will disallow

that component of WSFS' proof of claim in large part.

---

[5]  There is an occasional exception to the principle stated above in the text.  In determining the allowability of a claim, the burden of proof is governed by nonbankruptcy law (usually, but not always, state law) on which the claim is based.  Usually, the burden of persuasion is on the party asserting that it holds a valid monetary claim against the bankruptcy estate.  But if nonbankruptcy law places the burden of proof on a party objecting to a claim, that burden applies in proof of claim litigation in the bankruptcy court.  See Raleigh v. Illinois Dep't of Revenue, 120 S. Ct. 1951, 1955–56 (2000).

[6]  The initial Objection was broader in scope. The Debtor narrowed the objection based upon the discovery she received prior to the hearing on the Objection. The Debtor does not question the $16,372.70 in delinquent principal and interest payments included in WSFS's proof of claim.  The Debtor also has conceded that escrow advances for real estate taxes and the pre-default escrow advance deficit are valid and allowable, leaving only the FPI and legal expenses at issue.

### A. The Debtor's Evidence Offered to Meet Her Initial Burden of Production

To meet her initial burden of production to overcome the prima facie validity of WSFS's proof of claim, the Debtor largely relies on two (2) pieces of evidence.

First, the Debtor points to the loan history attached to the proof of claim[7] and suggests that it is sufficiently odd or irregular as to cast doubt on its accuracy, at least with respect to the asserted FPI advances.

The first advance for FPI in the loan history was on January 31, 2013 in the amount of $274.45.[8]  Later entries on the loan history suggest that WSFS was making regular monthly premium payments of slightly less than $55.00 per month.  Based on this evidence, it appears that this initial advance on January 31, 2013 represented five (5) months of insurance coverage.

The purported initial advance seems ordinary and regular, but what follows is not.  After January 31, 2013, there were no disbursements for FPI for fourteen (14) months.  WSFS next paid a FPI premium on March 5, 2014 in the amount of $54.89.  What confounds things, however, is the refund to WSFS on March 28, 2014 of $20.74 followed by another FPI payment in the amount of $2,283.56 on March 31, 2014 (which would represent more thirty-six (36) monthly premiums at the rate of $55.00 per month).  Then, WSFS inexplicably received another FPI refund of $867.67 one (1) month later on April 30, 2014 (which would represent about

---

[7]     Another, more detailed loan history was introduced into evidence, (See Ex. 11), but only for a limited purpose.  A hearsay objection to its admission into evidence was sustained and the document was not admitted for the truth of the representations and information contained within it.  (A.T. at 1:46-51).  Therefore, in evaluating the account records in this case, I am limited to the loan history that was attached to the proof of claim.  (As stated earlier, the proof of claim serves as both a pleading and evidence).

[8]     This advance roughly coincides with the February 2013 default date for payments of principal and interest, which is not contested by the Debtor.

sixteen (16) monthly premiums, still leaving the March 31, 2014 advance as the payment of roughly twenty (20) months of coverage).

There could be satisfactory explanations for this erratic history in the payment of FPI premiums.  But the point here is that the payment pattern in the loan history, viewed alone, is sufficiently odd to raise at least some question regarding the accuracy of the WSFS's account records.  Whether the peculiarity of the FPI payment pattern described above, by itself, is sufficient to burst WSFS's prima facie bubble is not something I need to decide because there is more to consider.

The Debtor established that she made a specific, formal discovery request, asking WSFS to produce anything - including invoices from the insurers or checks cut to the insurers for the appropriate amounts - to substantiate that the FPI charges were incurred and paid.  (Ex. 13).  Further, the Debtor showed that WSFS produced no documents responsive to her request (even though it produced documents verifying the amounts and actual disbursements made for other escrow charges, such as property taxes and attorney fees).  The Debtor asks that I draw a negative evidentiary inference from WSFS's nonproduction.  See Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 334 (3d Cir. 1995); see also Sacko, 394 B.R. at 100-01. I will do so.


### B.  Weighing the Evidence

In evaluating whether WSFS's prima facie case withstands the Debtor's challenge, I have a modest record: the sworn loan history attached to WSFS's proof of claim, the existence of odd entries within that loan history, and a negative inference that may be drawn from WSFS's failure to produce proofs of payment. So, on one hand, WSFS lacks proof of payment for any of the FPI advances, which include the single largest line item in the entire payment history.  Yet, on the

8

other hand, the loan history shows disbursements for FPI and, given the Debtor's admission that she allowed her property insurance to lapse, it is reasonable to believe that WSFS filled that shortfall by procuring FPI.

The issue is a close one, but I find that the irregularities in the loan payment history and WSFS's failure to provide discovery that would explain the nature of the FPI charges and corroborate that the payments were made succeed in satisfying the Debtor's initial burden of production, thereby overcoming the prima facie validity of this component of WSFS's proof of claim. [9]

WSFS has failed to offer additional evidence to support its prima facie claim with regard to FPI charges. Consequently, the Debtor's objection to FPI charges will be sustained.

Although the Debtor's objection will be sustained, the amount deducted from the WSFS arrears claim will be less than that asserted by the Debtor.

WSFS's proof of claim includes two (2) rebates in favor of the Debtor totaling $888.41 which are attributed to "Insurance Refund." (POC 9-1 Payment History at 3/28/14 and 4/30/14).

---

[9]    The Debtor put forth another piece of evidence that lent further support to her effort to overcome the prima facie status of WSFS's proof of claim.

Under the loan documents, the Debtor is obliged to maintain insurance on the property and WSFS may advance premiums for insurance only if the Debtor fails to perform that obligation. The Debtor testified that her self-procured insurance lapsed in 2014. (A.T. at 0:46). This testimony was designed to suggest that an irregularity exists in the payment records, i.e., that FPI advances were being made in 2013, while the insurance obtained by the Debtor was still in place.

In finding that the Debtor has met her initial burden of production on the Objection, I have not relied on this evidence. Based on my observations during the hearing, I do not question the Debtor's honesty. However, neither do I find her to be a reliable historian with respect to the specific dates and the precise sequence in which various events occurred in her relationship with the mortgagee. Specifically, I am not convinced that the Debtor could pinpoint the lapse date of the property insurance that she purchased.

WSFS is only seeking to collect the net amount it claims it paid for FPI; it has already deducted the rebates against the claimed advances.

Therefore, I will disallow FPI charges in the net amount of $2,328.76, rather than $3,217.17. This disallowance will prevent the Debtor from obtaining a double-recovery on the insurance refunds.

## VI.  THE CHARGES FOR ATTORNEY'S FEES AND COSTS

### A.  The Debtor's Position

The second component of the Objection is the Debtor's challenge to WSFS's claim for $5,762.47 in prepetition legal expenses.

The Debtor does not dispute the occurrence of a contractual default that would permit the assessment of legal expenses.   However, she asserts that the legal expense component of WSFS' claim must be disallowed because WSFS failed to satisfy a contractual condition precedent to the institution of legal proceedings and the assessment of legal expenses.

The Debtor's argument is based on the mortgage provision that requires WSFS to deliver pre-foreclosure notices "required under law applicable to the Mortgage."  The subject mortgage provides:

> If I [i.e., the Debtor] default in paying any part of the obligation secured by this Mortgage or if I default in any other way under the Note or this Mortgage, or under any other mortgage on the Premises, **you** [i.e., WSFS], at your option and **after the delivery of any notices required under law applicable to this Mortgage and the expiration of any time periods provided in such notices, may** declare the entire obligation secured by this Mortgage due and payable without further demand and **foreclose on the Mortgage.  I agree to pay a reasonable attorney's fee plus court costs.**

(Ex. 1) (emphasis added).[10]

This provision of the mortgage expressly permits fee shifting in the event that WSFS institutes foreclosure proceedings following a default, but is subject to a condition precedent. Acceleration of principal and the commencement of legal proceedings must be preceded by the delivery of notice to the Debtor.  The Debtor reasons cogently that the mortgage contract does not authorize WSFS to charge attorney's fees and costs for foreclosure proceedings unless those foreclosure proceedings were preceded by compliance with the contractual condition precedent, "the delivery of any notices required under law applicable to this Mortgage."

In making this argument, the Debtor invokes 35 P.S. §1680.401c et seq., (commonly known as "Act 91") as the "law applicable to this Mortgage."  Act 91 established the HEMAP benefit program which provides eligible borrower/mortgagors with assistance in the form of loans designed to cure existing defaults and prevent a foreclosure on the borrower's residence. See 35 P.S. §1680.401c(b).

Act 91 also adds a procedural requirement to actions in mortgage foreclosure in Pennsylvania – the pre-foreclosure delivery of what is commonly called an "Act 91 Notice." That notice provides a delinquent homeowner with notice of and the opportunity to apply for HEMAP benefits, along with contact information for an agency qualified in assisting the homeowner in the application process.[11]  The notice must be sent "at least thirty (30) days before

---

[10]     The Debtor entered a loan modification in 2007, but this modification did not change the notice or fee shifting terms of her mortgage.  (See Ex. 7, ¶7) ("All other terms remain unchanged").

[11]     35 P.S. §1680.403c, provides in pertinent part:

> (a)     Any mortgagee who desires to foreclose upon a mortgage shall send to such  mortgagor at his or her last known address the notice provided in subsection (b)  . . . .
>
> (f.n. cont.)

the mortgagee . . . begins any legal action, including foreclosure, for money due under the

mortgage obligation." 35 P.S. §1680.403c(b)(2)(ii).

Although the Debtor received a pre-foreclosure notice, the notice she received (Ex. 5),

was designed to comply with a separate "law applicable to the Mortgage," Act 6 of 1974, 41 P.S.

§403 ("Act 6 Notice"), not Act 91.  The Act 6 Notice did not provide the Debtor with certain

material information required by Act 91.  It did not inform the Debtor of HEMAP; it did not

mention the 30-day time period to engage with the program; and it did not provide contact

information for a housing counselor.  See 35 P.S. §1680.403c(b)(1).  For all practical purposes,

the Debtor was not provided with the information the Pennsylvania Legislature deemed critical

to give homeowner's an opportunity to seek HEMAP benefits.  See Benner v. Bank of Am.,

N.A., 917 F. Supp. 2d 338, 362 (E.D. Pa. 2013) (one of the purposes of Act 91 is to insure that

homeowners are aware of the potential for state-funded assistance).

According to the Debtor, this failure to comply with Act 91, i.e., the "law applicable to

this Mortgage," establishes the merits of her objection to the allowance of the legal expenses.

---

(f.n. cont.)

> (b)(1)   This notice shall be in plain language and specifically state that the recipient of the notice may qualify for financial assistance under the Homeowner's Emergency Mortgage Assistance Program. This notice shall contain the telephone number and the address of a local consumer credit counseling agency. This notice shall be in lieu of any other notice required by law. This notice shall also advise the mortgagor of his delinquency or other default under the mortgage, including an itemized breakdown of the total amount past due, and that such mortgagor has thirty (30) days, plus three (3) days for mailing, to have a face-to-face meeting with a consumer credit counseling agency to attempt to resolve the delinquency or default by restructuring the loan payment schedule or otherwise. . . .

## B.  WSFS's Position

On its face, the Debtor's contention that WSFS's failure to send the Act 91 pre-foreclosure notice violated the contractual precondition to the initiation of foreclosure proceedings is meritorious.  However, WSFS responds with two (2) arguments.

First, WSFS asserts that the Debtor was categorically ineligible under the HEMAP program by virtue of 35 P.S. §1680.401c(a)(7), making it unnecessary for WSFS to send the Debtor a pre-foreclosure Act 91 notice.

Section 1680.401c(a)(7) states that the provisions of the statute governing HEMAP are not applicable if:

> The property is encumbered by more than two mortgages, other than a mortgage filed by the agency to secure repayment of the mortgage assistance loans, or by other liens or encumbrances which would unreasonably impair the security of the agency's mortgage.

Second, WSFS argues that even if its notice was deficient under Act 91, the Debtor has no legal remedy unless that deficiency caused her prejudice and that the Debtor presented no evidence that she was prejudiced.  The source of WSFS' "prejudice" argument is Act 70 of 2012, 35 P.S. §1681.5 ("Act 70"), which provides:

> **If there has been a failure to comply with the notice requirements of [35 P.S. §402c or 403c]** known as the Housing Finance Agency Law, and such failure has been properly raised in a legal action, including an action in foreclosure, for money due under the mortgage obligation or to take possession of the mortgagor's security, **the court may** dismiss the action without prejudice, order the service of a corrected notice during the action, impose a stay on any action or **impose other appropriate remedies in the action to address the interests, if any, of the mortgagor who has been prejudiced thereby.**

35 P.S. §1681.5 (emphasis added).

### C. Analysis

### 1. summary

The analysis is nuanced; but as explained below, I conclude that both of WSFS' arguments are without merit. WSFS was obliged to send the Debtor an Act 91 notice prior to commencing foreclosure proceedings and the Debtor has met her burden of demonstrating that this violation of WSFS' contractual and statutory obligation was prejudicial.

More specifically, while the Debtor was not a prime candidate for a HEMAP loan, the record does not establish that, as a matter of law, she was categorically ineligible for the program under 35 P.S. §1680.401c(a)(7), and that the mortgagee was relieved of its obligation to provide her with an Act 91 notice before commencing foreclosure proceedings. The Debtor was entitled to an Act 91 notice and awareness of her opportunity to present her situation to the Pennsylvania Housing Finance Authority ("PHFA"), the agency which administers HEMAP.

As for the prejudice requirement of Act 70, 35 P.S. §1681.5, PHFA's own policy statement suggests that WSFS' very failure to send the Debtor an Act 91 notice rendered her ineligible for HEMAP benefits. See 12 Pa. Code §31.202(e). Section 31.202 is titled "Eligibility for mortgage loan assistance" and states:

> (e) The **mortgagee shall have indicated to the homeowner, using the notice referred to in Appendix A, its intention to foreclose** or initiate other legal action to take possession of the secured real property. This notice need not be sent to homeowners who do not qualify under subsection (a), (b), (c) or (d).

(emphasis added).[12]

---

[12]    Pursuant to 35 P.S. §1680.404c(a)(2(i), eligibility for HEMAP benefits includes the requirement that the "mortgagee has indicated to the mortgagor its intention to foreclose." In addition, §1680.404c(a)(11) provides, as another eligibility requirement for benefits, that "[t]he mortgagor meets any other procedural requirements established by the agency." 12 Pa. Code. §31.202(e) would appear to be the product of these two (2) statutory provisions.

(fn.cont.)

14

The undisputed facts that the Debtor received no notice resembling an Act 91 notice and the existence of 12 Pa. Code §31.202(e) are sufficient to satisfy the Debtor's burden of production in this claims objection contested matter on the issue of prejudice.[13]

## 2. 35 P.S. §1680.401c(a)(7)

### a.

WSFS initially defends its noncompliance with Act 91 by arguing that it was under no obligation to send the Debtor an Act 91 notice because she was ineligible for the program pursuant to 35 P.S. §1680.401c(a)(7).

Section 1680.401c(a)(7) provides that the HEMAP statutory provisions are inapplicable in certain situations based on the existence of other mortgages and liens on the homeowner's property.  WSFS asserts that the Debtor fell into this categorical exclusion and, thus, that she was

---

(fn. cont.)

At first blush, the idea that the foreclosing party's failure to provide the required Act 91 notice to a delinquent homeowner should result in the denial of the homeowner's HEMAP application seems perverse.  However, I surmise that this policy is in place because HEMAP funds are limited and must be directed to homes imminently in danger of foreclosure.  See 35 P.S. §1680.404c(a)(7) (no HEMAP loan may be granted if the mortgagee is "prevented by law from foreclosing upon the mortgage.")  Since Act 91 notice is a necessary precondition for foreclosure, a mortgagee cannot foreclose legally without providing the notice.  Thus, the failure of a mortgagee to provide Act 91 notice means that the mortgagee cannot immediately foreclose and the HEMAP resources could be better spent elsewhere.

[13]    I am aware that PHFA's policy is merely a statement of policy and, as such, "not a regulation, and thus does not have the force and effect of law." R.M. v. Pennsylvania Hous. Fin. Agency of Com., 740 A.2d 302, 308 (Pa. Commw. Ct. 1999); see also Berman v. Pennsylvania Hous. Fin. Agency, 2015 WL 5159409, at *3 (Pa. Commw. Ct. Feb. 18, 2015) (nonprecedential), appeal denied, 117 A.3d 1282 (Pa. 2015).  Nevertheless, for purposes of determining whether the Debtor has met her burden of production, it is reasonable, in the absence of evidence to the contrary, to infer that PHFA follows its published statement of policy.

outside the reach of HEMAP and unable to save her house via the program.  Therefore, WSFS argues that it was not necessary to provide the Debtor with an Act 91 notice.

PHFA's policy statement lends some support to WSFS' argument.  12 Pa. Code §31.202(e) states that an Act 91 "notice need not be sent to homeowners who do not qualify under [12 Pa. Code §202](a), (b), (c) or (d)."  Section 202(d)(3) parrots 35 P.S. §1680.401c(a)(7).  Thus, on its face, PHFA's regulations appear to authorize a mortgagee to make the threshold determination under §1680.401c(a)(7) that the provisions of Article IV-C of the Pennsylvania Housing Agency Law, governing Homeowner's Mortgage Assistance, are "not applicable," 35 P.S. §1680.401c(a), thereby relieving the mortgagee from the obligation to send an Act 91 notice.

In the end, however, as explained below, the record does not support WSFS' position that the Debtor was categorically ineligible under §1680.401c(a)(7).  Consequently, she was entitled to an Act 91 notice and a chance to present her situation to PHFA.

.

### b.

35 P.S. §1680.401c(a)(7) is a provision that identifies an exclusion from statutory benefits.  The exclusion applies when

> [t]he property is encumbered by more than two mortgages, other than a mortgage filed by the agency to secure repayment of the mortgage assistance loans, or by other liens or encumbrances which would unreasonably impair the security of the agency's mortgage.[14]

---

[14]    I note that Act 91 contains two (2) separate provisions affecting eligibility for HEMAP benefits.

First, as discussed in the text, 35 P.S. §1680.401c provides a broad statement of categorical eligibility.  It states that Act 91 applies to all mortgages except those falling into seven (7) categories.  In addition, 35 P.S. §1680.404c(a), speaks more specifically to eligibility for HEMAP benefits.  Section 1680.404c(a) sets out thirteen (13) eligibility factors a homeowner must satisfy to receive benefits.

(f.n. cont.)

Consideration of the specific content of the exclusion is critical to the outcome of the parties' dispute.

The provision consists of two (2) clauses that create separate disqualifying factors, one of which is objective and nondiscretionary, while the other is based on the exercise of agency discretion.

The objective first clause focuses on whether a property is encumbered by more than two (2) mortgages, not counting PHFA mortgages granted through the HEMAP program. The meaning of this clause is clear, easy to apply and its purpose is sensible: if a property is encumbered by more than two (2) non-HEMAP mortgages, Act 91 does not apply to that property and, in the event that such a property comes in front of PHFA for evaluation, PHFA may not grant a HEMAP loan. In such a case, no purpose would be served by sending a homeowner a pre-foreclosure Act 91 notice.

The second clause is not objective; it is largely discretionary. This part of the statutory provision prohibits PHFA from extending a HEMAP loan for a property encumbered by liens or encumbrances "which would unreasonably impair the security of the agency's mortgage." This clause makes sense in guiding PHFA's second-step discretionary decision whether to grant a HEMAP loan. It directs PHFA to grant loans only when they are sufficiently collateralized, in order to ensure the program remains solvent in the long term.

―――――――――――――――

(f.n. cont.)

Oddly, five (5) of the seven (7) categorical eligibility factors in §1608.401c are repeated in §1680.404c(a) as factors for PHFA to consider in the actual loan eligibility determination, including §1680.401c(a)(7), the provision relied upon by WSFS. Due to the placement of the same text in these two (2) separate places in the statute, the provision is both a categorical exclusion to Act 91 coverage generally and a specific factor for PHFA to evaluate in deciding whether to grant a loan.

17

The critical point here is the discretionary nature of the second clause of §1680.401c(a)(7).  It is difficult to envision how the second clause can be applied by a mortgagee as a threshold, categorical screener, when it requires PHFA to evaluate whether its lien position would be unreasonably impaired if it granted a junior priority, secured loan.  In other words, how can a homeowner be categorically ineligible for benefits based on PHFA's discretionary determination that its potential lien position is too precarious, if the homeowner is not advised of the right to apply for HEMAP benefits and is deprived of the opportunity to present the facts to PHFA?

Thus, I have serious doubts whether the second clause can ever justify a mortgagee decision not to send an Act 91 notice to a borrower who is delinquent on a mortgage otherwise subject to Act 91.[15]  However, to resolve this contested matter, I need not decide that legal issue. Assuming arguendo that a mortgagee may determine ineligibility under the second clause of §1680.401c(a)(7), WSFS failed to develop a record establishing the Debtor's ineligibility under both the second clause, as well as the first clause of that provision of the statute.

c.

To reiterate, WSFS was relieved of its obligation to send a pre-foreclosure Act 91 notice only if either:

- under the first clause of §1680.401c(a)(7), the Debtor was excluded categorically from the HEMAP program because her residence was encumbered by more than two (2) mortgages, other than a PHFA mortgage taken to secure repayment of HEMAP loans; or

---

[15]     I recognize that 12 Pa. Code §202.2(e) purports to relieve a mortgagee of the obligation to send an Act 91 notice to a homeowner who is not eligible under §202.2(d)(3), and that §202.2(e) does not differentiate between the two (2) clauses of §202.2(d)(3) and 35 P.S. §1680.401c(a)(7).  This purported delegation of PHFA's discretionary authority to determine program eligibility to a mortgagee is arguably demonstrably irrational.

- under the second clause of §1680.401c(a)(7), the Debtor's property was encumbered by liens or encumbrances unreasonably impairing the security of the PHFA mortgage being sought in the HEMAP application.

The record before me establishes that just prior to the initiation of the foreclosure action, the Debtor's home was encumbered by one (1) mortgage held by WSFS and one (1) mortgage held by PHFA, and no other mortgages. (Exs.1, 9; A.T. at 0:52). The first clause of §1680.401c(a)(7) requires the existence of two (2) non-HEMAP mortgages for the exclusion to apply. That was not the case here.

WSFS fares no better under the second clause of §1680.401c(a)(7). Even based on the debatable assumption discussed above, i.e., that a mortgagee may make what is essentially an underwriting decision of PHFA, and the equally questionable notion that four (4) years after the fact, the bankruptcy court can assess whether the security of a PHFA mortgage would have been unreasonably impaired in 2013, there are no facts in the record which support WSFS' position that another HEMAP loan would have unreasonably impaired the security of PHFA's lien position. WSFS generated no factual record regarding the value of the Debtor's property and the state of the encumbrances on her property in 2013, just prior to the initiation of the foreclosure proceedings.

In terms of the shifting burdens in bankruptcy claims litigation, the consequence of the foregoing analysis is that the Debtor satisfied her burden of producing evidence proving that she was entitled to receive an Act 91 notice and that the failure to do so would preclude the shifting of subsequent legal fees to her. In response, WSFS points to §1680.401c(a)(7), but has not come forward with sufficient evidence to establish that the Debtor falls under that exclusion from the

HEMAP program.  Therefore, WSFS has not satisfied its burden of proof with respect to its

entitlement to shift legal expenses to the Debtor.[16]


### 3. Act 70, 35 P.S. §1681.5

WSFS's last line of defense is Act 70, 35 P.S. §1681.5, which requires that a party

establish prejudice before a court may grant a remedy based upon the violation of Act 91's notice

requirements.

At the outset, WSFS is on solid ground insofar as it suggests that the prejudice

requirement of Act 70 applies in this claims objection contested matter.  This principle is

supported by the statutory text.  Act 70 refers to a party raising an asserted violation of Act 91's

notice requirement "in a **legal action**, including an action in foreclosure, **for money due under

the mortgage obligation** or to take possession of the mortgagor's security."  35 P.S. §1681.5.

(emphasis added).  Thus, Act 70's denial of "other appropriate remedies" based on an Act 91

notice violation that does not cause prejudice is not limited to state court foreclosure action, but

applies in any legal proceedings involving "money due" under the mortgage.  This bankruptcy

---

[16]    WSFS makes one (1) other, related "ineligibility" argument.

WSFS points to an online "FAQ" posted by PHFA stating that to obtain a HEMAP loan, the resulting PHFA mortgage must have at least third lien position.  See HEMAP Frequently Asked Questions, http://www.phfa.org/counseling/hemap.aspx (last visited 11/3/17).  WSFS contends that a second PHFA mortgage would have had fourth position – or worse – because of the various mortgages and liens on her property, a factual contention that appears accurate.  WSFS therefore posits PHFA would not have granted a HEMAP application, making the pre-foreclosure Act 91 notice unnecessary.

Again, the factual record does not support WSFS's position.

Further, PHFA's published policy statement, 12 Pa. Code, §31.202, includes no requirement that PHFA hold a third lien position; rather, there is only the discretionary requirement that PHFA's lien position not be impaired.  Thus, it is hardly clear that the Debtor was categorically ineligible for HEMAP benefits due to the putative "third lien" requirement.  The failure to send the Debtor a pre-foreclosure Act 91 notice cannot be justified on this basis.

court claims objection contested matter indisputably is a legal proceeding regarding money due under a mortgage and partial disallowance of the claim would be an "appropriate remed[y]" under Act 70.

Based on the Act 70 prejudice requirement, for the Debtor to overcome the prima facie validity of the legal expense component of WSFS's proof of claim, she must satisfy her burden of production on the issue; i.e., she must offer some evidence that she was prejudiced.

On the record presented, I am satisfied that the Debtor met this burden.

The Debtor testified that, notwithstanding the absence of an Act 91 notice, she applied for HEMAP benefits in 2014 after her loan modification request was denied as part of the state court mortgage foreclosure diversion process and that PHFA denied her 2014 HEMAP application.

At first blush, it might appear that the Debtor was not prejudiced. Despite the fact that she did not receive an Act 91 notice, she managed to apply for HEMAP benefits. See Wells Fargo Bank, N.A. v. Monroe, 966 A.2d 1140, 1143-44 (Pa. Super. Ct. 2009) (a faulty Act 91 notice does not require dismissal of a foreclosure complaint where the homeowner nonetheless had the opportunity to apply to PHFA for HEMAP benefits).[17] However, the factual basis for PHFA's denial of the Debtor's HEMAP application is not in the record. Neither party presented any evidence explaining why the Debtor's HEMAP application was denied.

In light of PHFA's policy requirement that an applicant must receive an Act 91 notice, see 12 Pa. Code §31.202(e) (discussed above in Part VI.C.2.a), it is plausible to infer that, in this case, the Debtor was denied HEMAP benefits **because** she did not receive an Act 91 notice.

---

[17]    One commentator has suggested that the prejudice requirement in Act 70 is largely a codification of the holding in Monroe. See Irv Ackelsberg, Residential Mortgage Foreclosure §10.2, at 10-7 (2012).

Based on this inference, which I draw, the Debtor has made a sufficient showing of prejudice to meet her burden of production in objecting to WSFS' proof of claim.

That said, I acknowledge the possibility that PHFA denied the Debtor's HEMAP application on one (1) or more other, substantive grounds; i.e., that despite the absence of an Act 91 notice, that PHFA nevertheless considered and rejected the Debtor's HEMAP application on its merits for failure to satisfy some other HEMAP benefit eligibility requirement.  If that is what actually occurred, this case would be indistinguishable from Monroe.  But I have no evidence of that.  WSFS certainly could have offered evidence on that point, but it did not and, in ruling on the Objection, I am limited to the evidentiary record generated by the parties.

In short, WSFS has failed to counter the Debtor's evidence with regard to legal expenses. Because WSFS bears the ultimate burden of proof, the Debtor's objection to the allowance of expenses must be sustained.

## VII. CONCLUSION

For the reasons set forth above, WSFS' claim for prepetition mortgage arrears will be allowed, subject to the reductions set out below:

| | |
|---|---|
| $29,972.28 | amount claimed |
| ($ 2,328.76) | partial disallowance of escrow component of claim |
| ($ 5,762.47) | disallowance of legal expenses |
| ($     34.90) | inspection fees |
| **$21,846.15** | **allowed claim for prepetition mortgage arrears** |

An appropriate order follows.

Date: <u>11/10/2017</u>

**ERIC L. FRANK**
**CHIEF U.S. BANKRUPTCY JUDGE**